# IN THE U.S. DISTRICT COURT
## OF SEDWICK COUNTY, KANSAS

**In the Matter of:**

**FORREST L. GEIST & HEIRS,**

**Plaintiff(s),**

**vs.**

**KANSAS STATE UNIVERSITY, ET AL,**

**Defendants**

**Case No. 6:23-cv-01129-JWB-GEB**

### RESPONSE TO DEFENDANTS' FILINGS & MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

(Assigned to the Honorable Judge John W. Broomes)

**COMES NOW** Plaintiff, FORREST L. "LENNY" GEIST, in response to Defendants' filings.

In a letter to Andre' Limozin written in Paris on 22 December 1787, Thomas Jefferson said, "*Ignorance of the law is no excuse in any country. If it were, the laws would lose their effect, because it can be always pretended.*"  Defendants think original literary work in documents or online has no bundle of rights, safe harbor security or require compensation to creators when derivatives are used from such work. Many recent US Supreme Court rulings give clear and convincing strength to Intellectual Property (IP) owners and their rights to original work as well as derivatives of their work comprehensively. Defendants' filings verify they are using my IP illegally thinking (falsely) it has no legal protection.

The US Constitution gives Congress the power to enact laws "*To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.*"  With this ability, authors, artists and inventors earn legal bundles of rights.  Per 17 U.S. Code § 102 - subject matter of copyright, '*this includes literary works that include expressions of words and numbers regardless of the nature of the material objects in which they are embodied.*'  My descriptive service mark (**page 13**) intimates customizing food production, new housing, cyber/data security (Kansas Klouds), education, energy prod., research stretching across diverse public and private sectors, infrastructure upgrades, promoting economic programs (entrepreneurism), novel retail goods/services, etc. This is protected literary work, but aren't the misappropriated trade secrets in question.  Dr. Linton recited my mark verbiage in his 1/17/23 press conference. Defendants' unlawful use of my IP is confirmed by a derivative effort (K-State 105) based on my protected, proprietary work.  In conjunction therewith, my **trade secrets** are in business plans, custom proposals, marketing plans, and other literary work.  Many trade secrets Defendants embezzled are in tailored documents shared privately.  KSUF said my trade secrets were "quite complex" and "ambitious without proof" as stated in the KSUF 8/23/18 follow-up letter. Defendants entered the free marketplace **(Exhibit A)** using my IP. KSUF is a separate legal entity from the university and is classified as tax-exempt, charitable entity within the voluntary sector.

Paying for a trademark illustrates my motive to safeguard, whereas Defendants' reciting my seminal, original work in a press conference w/o my approval shows their motive was to steal.

Envision USPTO applicants submit their images (design/drawing/pic) along w/descriptions of utility, purposes, or transformative uses that create economic benefits. Bad actors see such and say; "It's in the public domain."  Predatory seizure of content (with or w/o image) is used to begin a competing endeavor (derivative). This creates extensive harm to USPTO applicants and usurps **safe harbor protections** the Supreme Court ruled IP originators have.  **Safe Harbor** secures content w/o proper reg.  Defendants used text from my service mark, docs, & website to start a derivative. I wrote content to earn legal rights -- not forego them.  Registering content w/USPTO shows this. **Trade dress** rulings (Mixed Chicks v. Sally Beauty Supply) support my case convincingly, too. **(Exhibit B)**

Filers use the portal to **give notice of legal of rights** whether trademark, patent, or copyright. Filers don't use the service to jeopardize original work or offer it for marauding misappropriation. Descriptive mark content is copyright protected.  As I noted, my trade secrets are in other texts.

Inarguably, the US Supreme Court (USSC) made recent rulings (AEI analysis) in copyright infringement and trade secrets cases (Intellectual Property) that firmly support IP creators like me.

In Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 20-915, the USSC confirmed copyright holders have a "Safe Harbor" for any mistakes of fact or law made in good faith. Related analysis is noted herein **(Exhibit C)**. The USSC sided with Unicolors' position that 'inadvertent misunderstandings whether of fact or law were **not** the inaccuracies for which the Supreme Court was concerned.' Copyright protections apply to all original work that is 'fixed to a tangible medium of expression' and earns a legal bundle of rights with or w/o having a © mark or registration.  Registered service mark content fits this legal standard and allows for litigation for infringement of a mark's materials. Defendants blatant disregard for law wouldn't have been deterred by a Copyright.gov submission.

Citing U.S.C. Title 17, IP attorney Nancy Wolff, a partner at Cowan, DeBaets, Abrahams & Sheppard, LLP {CDAS} led an interactive workshop involving **current IP law** that artfully included copyright infringement and the "pitfalls" many fall victim to.  Defendants and their attorneys did. Screenshots of some of her more potent expertise applicable to my case include those seen here on pages 3-4. As detailed later, many recent US Supreme Court rulings firmly support IP creators.

## Copyright Pitfalls

- If content is online, it is in the public domain.
- If there is no copyright notice associated with content, it's in the public domain.
- If I don't profit from the use, I don't need permission to use content.
- If I remove the content after notice from the owner, I don't owe any money to the copyright holder.
- If I alter the content by a certain percentage, I don't need permission.
- If I only use some of the content, I don't need permission.

## Is Copyright Notice Needed?

- Since March 1, 1989: Copyright notice is no longer required for published works (U.S. joined Berne Convention)
- Notice is voluntary, but recommended
- Proper notice: © year, name

**What is the Public Domain?**

- Consists of ALL works out of copyright:
  - In the U.S., all works published before 1923;
  - U.S. government works;
  - Works that fell out of copyright for failure to register or renew under the 1909 Act or for lack of copyright notice before 1989 (except some foreign works).



**Derivative Works**

A derivative work is a "work based upon one or more preexisting works."

Dramatizing, fictionalizing, recasting, or otherwise adapting a copyrighted work without permission may amount to copyright infringement.

**The issue in licensing is whether the use would be a *true* derivative work or qualify as *fair use*.**

<u>My original work is not in the public domain. It is legally protected</u> if posted on my website, my professional profile, in emails, or part of my literary work (digital/printed) like business plan(s). Defendants' attorneys suggest (**pg. 9 of response below**) their clients think my protected Intellectual Property (IP) has no legal bundle of rights and allows for unrestricted use. This is untrue. Infringers are liable for damages.  If elements of this matter are somehow (mis) construed, recent Supreme Court rulings provide "Safe Harbor" for those who are authors, creators, developers, inventors, or proprietors who make mistakes in good faith trying to gain legal shields.  Justice Breyer implied 'authors aren't attorneys' {**Unicolors Inc. v. H&M}**, and **the USSC wants to protect creators**.  Also, our Fourth Amendment protects private citizens/sector against unlawful gov't seizure of property.

Defendants' believe data in the public record or accessible online means it is in the public domain by default. <u>This is not true.</u>  An example would be the fact my name, address, and contact information are included in my descriptive service mark application on the USPTO website.  This does not give another entity, natural person or otherwise, authority to use my data (identity theft).

The **intent** for copyrights/patents/trademarks is to <u>obtain legal rights</u> -- <u>not relinquish them.</u> {*prima facie evidence of validity*} Defendants' response indicates they believe, so they misappropriated my assets and then willfully engaged in tortious interference causing $3.0B in actual damages.

Submitting an exec summary as part of my descriptive service mark app on the USPTO site fortifies my position that <u>using this portal shows **intent to register** data to gain legal rights + safety</u>. Attaching a summary with my trademark app was more cost-effective and practical for registration than constantly resubmitting changes, enhancements, or novelties to the Copyright.gov site ($$$). Further, Defendants demonstrated their notion is my self-authored content registered on a federal website is void of any legal rights (incl. Safe Harbor) and enables them to steal it, which they did.

 The exec summary doesn't include trade secrets in question as part of IP Defendants stole. Defendants believe seeking and procuring legal rights by using government websites or authoring Content on one's own website (not public domain) allow them to commandeer content they deem of value w/o remunerating creator(s).  This is what Defendants did as well as, potentially, other co-conspirators not yet named herein.  <u>Public access to a website does not constitute public domain.</u> Defendants are/were mistaken that data/info accessible on a website surrenders its rights/safe harbor. My website's content is copyright protected. My authentic, novel and valuable trade secrets **in documents** are protected by IP laws including internationally (**Berne Agreement** – **Exhibit D**).

trade secret protection. *See Mont. Camo, Inc. v. Cabela's, Inc.*, No. 1:08-cv-00071-RFC, 2010 WL 2399548, at *4 (D. Mont. June 11, 2010) (plaintiff made "no effort to maintain secrecy" of supposed trade secret when it was posted on a public website).

And perhaps the most prominent example of the lack of any efforts by Mr. Geist to maintain the secrecy of his "business plan" is that he included a slide deck describing the "business plan" in a filing with the United States Patent and Trademark Office as part of his application for the TECHNOLOGY ENHANCED AGRICULTURE trademark. (*See* Ex. 1.) That slide deck appears to be either identical to or contain many of the same elements of "Freedom Farms" that Mr. Geist now claims secret. Mr. Geist even admits that he "authored language in his trademark application submissions that appear on the trademark certificate itself *that include words illustrating his novel ideas*." (Dkt. 1-1, p. 2.) (emphasis added) This allegation alone defeats Mr. Geist's trade secret causes of action as trademark applications are public record available for anyone to access. His "business plan" was therefore not "secret" under any meaning of that word, including in the relevant statutory definition. Setting aside all of the other necessary elements, without a secret Mr. Geist has no cause of action for misappropriation of a trade secret, and Counts I and II must be dismissed.[5]

### 2.   Count III: Violation of Economic Espionage Act

In Count III, Mr. Geist claims that "Defendants committed federal crimes by illegally using [his] business plan's content" and thus committed economic espionage under 18 U.S.C. § 1831-1839. (Dkt. 1-1, p. 8.) The Economic Espionage Act makes it a criminal offense to steal a trade

---

[5]   Mr. Geist's claimed business plan is not a trade secret also because he does not allege that his plan was not "generally known" or "readily ascertainable by proper means." Again, the bounds of Mr. Geist's claimed secret are not at all clear, but if it consists of a business plan incorporating "ag-tech campuses" in each of Kansas' 105 counties, this is not a novel idea. As the Economic Prosperity Plan notes, "educat[ing] the citizenry and advanc[ing] the well-being" of Kansas communities has been part of K-State's mission for well over 150 years. (Ex. 2, p. 1.)

9

---

Yet Unicolors offered some of the designs to the public and others only to certain customers.[75] Unicolors sought to take advantage of a safe harbor provision in the Copyright Act, which says a registration certificate with mistakes is still valid unless "that inaccurate information was included on the application for copyright registration *with knowledge that it was inaccurate.*"[76] The Ninth Circuit ruled that this safe harbor applied only to "good-faith mistakes of fact, not law."[77]

Writing for the Court, Justice Breyer reversed the Ninth Circuit, holding that the safe harbor applied to mistakes of either fact or law.[78] Unicolors, he wrote, made a legal labeling mistake. At the time of registration, the company did not know that the 31 designs could not be considered a single unit of publication.[79] Justice Breyer rested his decision on the language of the statute, writing that it did not distinguish between factual and legal mistakes.[80] He also reviewed the statute's legislative history, finding that Congress wanted "to make it easier, not more difficult, for nonlawyers to obtain valid copyright registrations."[81] Justice Breyer's final copyright opinion, then, marked one of the rare occasions in which he sided with copyright owners.

Defendants imply (prior page) they confiscated my IP willfully -- violating federal laws. Instead of making reasonable efforts to ensure they didn't violate IP laws by contacting me, they covertly conspired to pilfer my valuable work to fraudulently forge ***derivative*** endeavors to illegally supplant mine. The not-for-profit Defendants entered the commercial marketplace w/my property.

Similarly, a civil suit v. Paramount Pictures for using "***Top Guns***" copyrighted content from a May 1983 ***California* magazine** story by Ehud Yonay for a sequel to the film "***Top Gun***" (1986) shows extended rights original creators have over derivative work including after licensing rights expire. Paramount acquired Yonay's licensing rights to his work as basis for the first "***Top Gun***". The copyright agreement expired in 2020. Paramount execs did not approach Mr. Yonay's heirs about renewing rights. Instead, Paramount produced "TOP GUN: MAVERICK" and released it in 2022 w/o compensating his heirs for a new "derivative", which grossed **$1.5B**. Defendants had opptys to acquire legal rights to my work {**I own for my life + 70 years Title 17 U.S.C. §302}** for their derivatives.

Defendants' filings often substantiate my position(s). Per KSU's 14-pg. pamphlet (exhibit) titled, "***K-State's Plan for Economic Prosperity in Kansas***", content will not withstand forensic scrutiny of its origin date. It is a feeble attempt to deceive the Court.  If KSU's derivative plan started in 2019, Defendants violated our confidentiality agreement (8/23/18 KSUF letter) that is a contract. KSUF's Benjamin Johnson wrote it prior to misappropriation of my Intellectual Property for "K-State 105". They are unjustly enriching themselves using my Constitutionally-protected trade secrets and/or copyrighted info. Defendants have converted w/o authorization my IP that securities laws required me to disclose. As noted, Defendants are improperly using my original work related to building a statewide network of 105 mixed-use real estate developments as for-profit undertakings. My trade secrets are not generally known and were reasonably protected. Defendants are illegally using my custom financial figures, competitor analysis, cost forecasts, budgets, industry tactics, experts' viability docs, supply sources, offtake markets, funding nuances, tax-equity know-how, food production, geographic choices, public-private relationship tie-ins, proprietary software codes, etc. "K-State 105" is, in all reality, a derivative of my business plan(s) (literary work).  **Exhibit E** is one trade secret I shared w/KSUF on 7/9/2018 and other defendants later. I discussed it privately with Congresswoman Lynn Jenkins on 10/16/17. Lynn Jenkins is a CPA, KSU grad, and rural advocate.

I met KSU ag college leaders in Manhattan on **4/24/18 @ 4pm**.  I presented (by projector, not printed) a tailored, 157-pg., public-private partnership plan I kept on a flash drive (to show my sonable efforts to protect) that lifts all 105 counties economically using my trade secrets. I opened our dialogue saying what we're about to discuss would be '***private and confidential***'. **They agreed**.

Dr. Minton said my secret plan was "beyond scope" of the ag college and not what the university's purpose is (research + education). He said it didn't align with KSU's strategic vision as stated in KSU's messages. He repeated KSU is a not-for-profit.  The "K-State 105" pamphlet is a nebulous effort in deception. The motive behind this brief, diluted, and generic brochure is to make readers think "K-State 105" is an economic prosperity (business) plan they forged. It's a derivative of mine.

During our meeting, Dr. Minton chose not to move forward with anything resembling a new network of 105 real estate projects that offered a variety of products, services, and technologies. Dr. Minton dismissed the idea of interdisciplinary collaborations with private entities I identified as viable as well as valuable prospective partners financially & otherwise. I stated these tie-ins could benefit the university, agriculture college, students, research efforts, and commercial enterprises as well as K-State grads, alumni, and supporters.  Dr. Minton said, "That's not what we do.  We're focused on research like agro defense.  We have commitments to our existing research partners."

Undeterred, I met with the university's endowment leaders in confidence on **July 9, 2018** in Manhattan to privately discuss how my trade secrets, copyrighted content, and original work could be treated via prospective joint ventures, partnerships, or other collaborative arrangements.

The KSU Foundation (KSUF) executives were unfamiliar with my advanced, authentic, and paradigm-shifting compilations of new methods to blend resources and technologies to establish sizable, sustainable, competitive advantages poised to cultivate generational improvements. They dismissed my ideas, financing expertise, and proposal as a whole as too complex and unproven. Six weeks later (8/23/18), the KSUF Sr. Director of Gift Planning, Benjamin Johnson, who is a certified public accountant (CPA) with a law degree from the University of Kansas (KU), sent me a two-page letter (**Exhibit C** in original petition) acknowledging and agreeing that my proposal and its related concepts, data, documents, and other materials were "private and confidential."  Mr. Johnson explained the university and the endowment group had no interest whatsoever in my original work citing it was too complex, too complicated, ambitious without proof, not something anyone could easily describe (even after my lengthy explanations), and my financing options to include public subsidies were too bewildering…perhaps nothing but a fraudulent "tax scheme".

I rec'd similar disbelief and disinterest from rural economic development group Defendants when discussing my IP (custom proposals) that would lift their communities and/or regions. No Defendant received consent and/or legal authority to disclose or use my IP.  The fact Defendants stated my trade secrets were "too hard to understand" confirms basic USPTO items and language are not the trade secrets in question. They took trade secrets from customized docs + discussions.

Per Metallurgical Ind. Inc. v. Fourtek, trade secret disclosures made to further economic interests remain protected.  Defendants are fiduciaries of tax-exempt entities limited in scope.  I assert they are operating outside of customary and lawfully-regulated roles as not-for-profit entities purposed to aid and foster other businesses and initiatives that will, in turn, benefit their communities and organizations within narrowly defined limitations and roles. Yet, Defendants are unjustly enriching themselves using my IP w/o consent. Defendants are required to be in service to others including business owners, agencies, benefactors, religious groups, elected officials, municipalities, and others, whether current or potential, to aptly meet their needs. University foundations are legally categorized as charitable organizations per the Internal Revenue Service (IRS). Federal and state laws say economic development agencies that serve public interests are fiduciaries.  **(Exhibit F)** Defendant's own commercial general liability insurance (CGLI) underwriter, Cincinnati Insurance, filed a complaint (**6:23-cv-1139**) against the KSUF distancing itself from the Defendants corruption.

Defendants validate on their websites their support roles/responsibilities. Their sites confirm advocacy, duties, and obligations to enhance Kansas communities by providing resources to others intending to start new businesses, grow businesses, or collaborate with public entities to help private operators reach objectives that, in turn buoy their communities. They are fiduciaries. A tax-exempt entity is not allowed to maneuver with for-profit motives that benefit them beyond normal scope and are prohibited from self-dealing. They cannot use excess net income to benefit **any** private citizens or businesses (addressed later). As fiduciaries, university foundations, public universities, and economic development agencies, et al. are strictly prohibited from any/all efforts that possibly lead to misappropriation of business plans (literary works), business opportunities, concepts, data, and/or private communications whether verbally, by video conferences, emails, or video conferences, to enrich themselves at any given proprietor's expense. Misappropriation of Intellectual Property (IP), Trade Secrets (TS), Copyrighted Content (CC), and other provided confidential, proprietary, and sensitive information constitutes violations of federal and state laws as well as professional ethics. Misappropriations and ethical breaches may include conspiracy to commit such acts and, quite often, include cybercrimes, computer fraud and abuse, etc. The latter entails computer-based activities that exceed authorization (unlawful purpose).  The Defendants' public communications are included below as screenshots confirming their purposes to include functioning as fiduciaries.  **(Exhibit G)**  The exhibit includes inarguable evidence (screenshots) that a university foundation is a charitable organization. The Council for the Advancement and Support of Education (CASE) states very clearly that "***a college or university exists solely to support students, research, and learning within a college, university, university system, college or college unit***"

on its website. The Kansas State University Foundation is a CASE member.  KSUF's president, Mr. Greg Willems, was a recent guest speaker at a CASE workshop that included warnings against fraud and abuse.  In such symposium, invited experts noted that a 2020 Global Study on Occupational Fraud & Abuse conducted by the **Association of Fraud Examination Experts**, found **education** and nonprofit industries were listed in the "Top 10" categories of documented fraud cases.  My evidence, experts, and witness testimonies will prove beyond a reasonable doubt the Defendants are guilty of these illegalities, too.  Evidence is found in the public press conference KSU president Dr. Linton held in the Capitol Building in Topeka on Jan. 17, 2023 and supported by the co-defendants to include a stage backdrop banner bearing the KSU and Network Kansas images.  Dr. Linton states at this summons that the "K-State 105" campaign intends to raise $3B in capital (investments) for constructing new daycare, installing infrastructure, developing real property, building housing, erecting data centers to host local cyber security, etc.   For-profit endeavors to deploy said across 105 counties come from my plans (literary work) while the $3.0B monetary commitment is **300% greater than its current endowment ($945M)** as of a March '23 report. This exceeds unrelated business income (UBI) limits set by the IRS and departs from the Land-Grant institutions' tax-exempt status.  Both violate law.  This indicates the "K-State 105" motive is for **economic gains** substantially similar to my Intellectual Property (IP). KSU's for-profit effort derived from my IP constitutes tortious interference w/210 occurrences in Kansas alone. (105 counties x 2 developments/county to allow for 1031 Exchanges if not in Opportunity Zones).

Per Internal Revenue Service (IRS) policy **(Exhibit H)**, "The organization **{501(c)(3)}** must ___not___ be organized or operated for the benefit of private interests, and *no part of a section 501(c)(3) organization's net earnings may inure to the benefit of any private shareholder or individual*. K-State's "economic prosperity (business plan)" and joint venture policy state private investors and private stakeholders may/will **profit** from investing and/or otherwise partnering with the university, et al.

The noted 14-page brief is saturated with statements proclaiming the benefits of **investing** with K-State, **commercializing initiatives**, bringing in investments from around the world (page 3), developing emerging companies, creating and incubating new businesses, developing strategic corporate partnerships and using "external investments" to allow implementation of plan. I assert that KSU and KSUF, in particular, are acting as broker-dealers in capital raising efforts in violation of tax-exempt statuses, Securities & Exchange (SEC) regulations, and their publicly-funded missions/purposes for a Land-Grant university to charitably serve others.  It's my position the brief is a derivative of my original business plan(s) that is generalized, masked, and misleading as the Defendants hope to blend stolen IP, TS, and CC with traditional research and education under the guise of the "K-State 105" program they now claim began in 2019 (page 3). If so, this provides

support of Plaintiff's position that KSU and the KSU Foundation are misappropriating the very confidential, proprietary information alluded to in the ***8/23/2018 letter on KSUF letterhead*** from **Mr. Johnson, (Exhibit I).** This verifies confidentiality and that my work is original (trade secrets). The pamphlet's opaque nature contains no cost-benefit analysis, no feasibility study (risk), no financial projections, no Sources & Uses table, no structured debt models, maps, development target sites, list of contributors and/or corporate partners, or prior announcement. If K-State began its "K-State 105" economic prosperity plan in '19 as the misleading pamphlet states, why didn't the previous president, Gen. Richard Myers, or the previous KSU ag college dean, Dr. John Floros, conduct a press conference to announce such a monumental undertaking that is more than 300% of the university's $945M endowment?   Why would KSU or the KSUF wait until Jan. 17, 2023 to let the public know of its economic prosperity plan and let others take credit for it?  Why wait 4+ years? **This makes no sense whatsoever**.  It is a clear misrepresentation of fact in hopes of confusing the Court and a potential jury about its illegal, nefarious, and unlawful activities that harm Plaintiff. Defendants will not be able to produce letters, funding assurance (audited reports), receipts, gifts, contracts, IRS filings, donor appreciation notes/letters, or a "K-State 105" original doc to support. If they could, this would still verify my position these two entities misappropriated what I presented to the groups in confidence in April and July 2018, respectively, with reasonable efforts to protect.

If Defendants retract their position of starting an economic prosperity plan in '19 (page 3), the January 17, 2023 public press conference corroborates my assertions Defendants colluded and conspired more recently to circumvent my intangible, protected property with the named rural economic and workforce development groups to enrich themselves unlawfully. They committed tortious interference causing me serious consequences. Under federal laws and Kansas Statutes, interfering with a potential business relationship is sufficient to cause damages with the infringing party liable for such damages per this 1986 Kansas case (***Turner v. Halliburton Co.***).  **(noted here)**

> Tortious interference with a prospective business advantage or relationship seeks to protect future or potential contractual relations and is predicated on malicious conduct by a defendant. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). The elements of tortious interference with a prospective business relationship are:
>
> "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct." *Turner*, 240 Kan. at 12.

This case closely mirrors **Reeves v. Alyeska Pipeline Service Company (1996)**.  Reeves planned to build a new visitors' center + retail shop at a scenic lookout (trade secret).  Reeves approached Defendant in confidence proposing a joint venture. Defendant misappropriated Mr. Reeves' trade secret and built the assets without him (tortious interference) causing Mr. Reeves severe harm. KSU and conspirators stole my real property development plans (trade secrets) in 105 counties.

Defendants now claim "K-State 105" began in 2019…right after discussing my IP privately. As noted, this violates our confidentiality agreement (contract) Mr. Johnson ratified on 8/23/18. If they actually began it shortly before the 1/17/23 press conference (after clandestine talks about my IP with rural economic/workforce dev. agencies in 2022), this fully substantiates my claims all Defendants pilfered my IP collusively. I plan to subpoena all data, docs, and devices to a forensic level I believe will critically authenticate assertions.  Defendants won't be able to produce credible evidence indicating they began the "K-State 105 Economic Prosperity (Business) Plan" in 2019 as the 14-page brochure now claims. Discovery will reveal the 14 pages' fraudulent nature, as this exhibit will be scrutinized for original creation date, modifications, and distributions. I am certain Defendants won't be able to verify their retro-fitted claims *requiring validation*.  I will seek forensic evidence (like image below) via subpoena and/or search warrants to confirm their materials' origin dates.  My materials can be day and time validated.  When I met w/KSUF leaders on **7/9/18** with a proposal, I kept it on a flash drive and didn't provide printed copies to them to protect secrecy. My PPT included sophisticated tax-equity matters and notably advanced, ***compliant*** approaches to leveraging high-value gov't subsidies.  The KSUF letter called my exquisite methods to do so a "tax scheme". The KSUF letter and 7/9/18 talk implied my funding approaches were fraudulent. This proves KSUF's inarguable *unfamiliarity* with my IP + tailored funding that includes tax-equity monetization that can be layered w/other subsidies.  Now, they illegally exploit such trade secrets.



The tax donation flow chart file is evidence that demonstrates my very refined expertise in bank lending, private financing, taxation, tax-equity investing, charitable fundraising, public-private partnerships, and estate plan ideas were new to KSU and the KSUF only to be misappropriated.

I truly met "**reasonable efforts to protect**" the IP/TS/CC by going through a cumbersome, laborious, lengthy, and sophisticated process of directly applying for and receiving a descriptive, service mark (trademark) from the United States Patent & Trademark Office using its official website. For the record, I did so individually w/o an attorney's assistance. I had lengthy phone calls w/USPTO attorneys Samantha Sherman and Dawn Feldman Lehker successfully resulting in a **Technology Enhanced Agriculture (TEA)** descriptive trademark to <u>protect my interests</u>.  This includes language registered in the mark's content area as my original work.  The Cornell Legal Institute defines a <u>descriptive trademark</u> as below.  The secondary meaning of a descriptive trademark is often the more essential aspect of the insignia/mark given it describes the applicant's/seller's goods &/or services produced, sold, maintained, &/or potentially licensed to third parties. The Defendants misappropriated the registered secondary meanings of my descriptive mark and aggravated their damages by committing <u>tortious interference</u> to illicitly start businesses like those I have planned.



As noted in my original <u>Petition</u> and <u>Demand Letter</u> to cease and desist, the question is not about use of the trademark itself.  The infractions include (but are not limited to) Defendants' use of the copyrighted content contained in the trademark's body text area to *forge a derivative enterprise*. The goods, services, cross-functional, and interdisciplinary enterprises described in the copyright-protected text area (original authorship) are some of the economic advantages and community enhancing endeavors that I fully intended to pursue as private developments of real property which, in turn, would become host to a number of novel approaches to collaborative economic,

education, faith-based, sustainable, and technological advances not yet in practice. The protected content area on the trademark application as well as the issued trademark notice audiences of the holder's intent to create (original work) enterprises involving real property assets, construction, homeowners' alliances (HOA), on-site food production for wholesale off-take clients and retail consumers, establishing international sales channels, establishing local data collection (analytics, cybersecurity, data processing), promoting the many benefits of Controlled Environment Agriculture (CEA) that may be referred to as indoor farming, vertical farming, raising awareness of cancer research and healthcare (via tie-in with KU Health System, etc.), helping entrepreneurs create businesses (incubators), help fund their aspirations, offer an angel investor platform for ideation and collaboration, producing renewable energy, elevating water awareness, advancing conservation of natural resources with special focus on water, blending traditional fuel sources with contemporary approaches (original work) that improve oil and gas functionality in terms of enhancing how said energy types can be sourced, stored, and deployed more efficiently. Per patent/trademark attorneys Sherman and Lehker, the USPTO site offers applicants limited options to editorialize or affect original content in the text body. The site, at the time of application in 2017, had limited radio buttons, drop-down boxes, and category choices a trademark applicant could select to accompany a registration. Paying to resubmit all future changes is cost-prohibitive. My 157-page customized slide deck (original literary work PPT) shown to but not given to KSU agriculture college representatives or the endowment group staff members contains far more confidential, proprietary, protected content than the descriptive service trademark reflects below. The rural economic and workforce dev. group Defendants rec'd, in confidence, custom PPTs, too.

As noted, this case doesn't involve use of the trademark **Technology Enhanced Agriculture (TEA)** itself. It involves, but is not limited to, the misappropriation of the descriptive service mark elements I registered w/USPTO and affixed to a tangible medium of expression. Defendants used the protected proprietary components and my trade secrets to begin the "K-State 105" endeavor.

Viewers will note the copyright-protected content (safe harbor protection by the registration in the content body of a descriptive service mark) illustrates how my registered work can and will blend diverse trade secrets across industries, both public and private, to benefit the citizenry in host communities as well as the US collectively.  I fashioned novel compilations of technologies, assets, functions, real estate developments, financing options, sales pipelines, new infrastructure, education platforms, new software, and localized cyber security that suggest economic prosperity. Defendants used my registered work (Dr. Linton mimicked in his press conference) plus my trade secrets shared privately to start competing, for-profit, mixed-use real estate projects (derivatives).

# United States of America

## United States Patent and Trademark Office

## Technology Enhanced Agriculture (TEA)

**Reg. No. 5,614,678**

**Registered Nov. 27, 2018**

**Int. Cl.: 35**

**Service Mark**

**Principal Register**

Forrest L. Geist (UNITED STATES INDIVIDUAL), AKA Mr.
9452 W 193rd Terrace
Bucyrus, KANSAS 66013

CLASS 35: Association services promoting the education, interests, and best practices for hydroponic growing of produce, improving renewable energy sources for indoor agriculture, soil and water conservation, solar greenhouse designs, integrating local data collection, namely, analytics to improve hydroponic produce production and efficiencies, marketing of hydroponic produce to wholesalers, retailers and end consumers, opening international sales and distribution channels of said produce, and advancing Technology to Agriculture Professionals and Stakeholders; Association services, namely, promoting diversity in the restaurant and hotel industries on behalf of employees, vendors, management, and owners; Association services, namely, promoting greater minority inclusion in the sports industry; Association services, namely, promoting societal, ecological and economic benefits from appropriate uses of indoor farming; Association services, namely, promoting the interests of professionals in technology and agriculture; Association services, namely, promoting the public interest and awareness in cancer research and education; Association services, namely, promoting public awareness of technology that improves Agriculture; Advertising and promotional services; Business management of homeowners associations for others; Business management of the nonprofit corporations and trade associations of others; Business records management services relating to business entity formation and associated state reporting requirements; Homeowner association services, namely, promoting the interests of homeowners in a specific community and marketing the community nationwide to prospective new residents and property owners; Labor unions; Political action committee services, namely, promoting the interests of professionals in Technology and Agriculture in the field of politics; Promoting public awareness of the need for Technology to Improve Agriculture; Promoting the goods and services of others by providing an interactive website where users can increase the current value of an online discount being offered by purchasing the goods and services associated with that discount in the form of an online coupon, voucher or gift card; Promoting the interests of Agriculture professionals by means of Technology; Providing a pricing program in the field of property and casualty insurance through which members of designated associations, organizations, and groups may be offered or granted downward adjustments in the premiums for such insurance; Trade association services, namely, promoting the interests of professionals in Technology and Agriculture worldwide

FIRST USE 10-1-2017; IN COMMERCE 10-1-2017

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown: "TECHNOLOGY ENHANCED AGRICULTURE"

Director of the United States
Patent and Trademark Office

KSU president, Dr. Linton, declares in the January 17, 2023 press conference in Topeka that the school, endowment group, and its rural economic and/or workforce development "partners" have launched a "K-State 105" economic prosperity (business) plan that is a derivative of my biz plan (literary work) for Kansas that expresses registered work for creating real property developments in 105 Kansas counties that will be home to the endeavors and intertwined industries noted in the descriptive trademark, 157-page public-private partnership proposal, and 200-page business plan disclosed (req'd by SEC laws for private offerings) in confidence to the 501(c)(3) entities, et al.

Dr. Linton states and the misleading 14-page pamphlet confirms motives are to start or advance "**commercial**" endeavors and/or to "**commercialize**" opportunities they became aware of (mine). Said options are those I personally ideated, put on paper, and articulated earning legal protection.

As Plaintiff, I am the inventor of the concepts, geographic deployment areas, technologies to include, industries to reimagine in hybrid formats for improved functionality and performance, establish education and learning incubators beginning as early as K-6, enabling rural students to thrive with customized education plans in their home communities all the way through doctoral studies, decentralizing cybersecurity, data administration, data processing, energy resources, and interweaving childcare, research and retail goods and services from one location. Further, I am the sole author/creator (original work) of the statewide network of interconnected enterprises that will be tailored to each community's specific needs and built for its greatest chance for prosperity.

As IP developer, I possesses a legal bundle of rights for my intangible assets (Intellectual Property) whether it be Trade Secrets (TS), Copyrighted Content (CC) or other created property. The Cornell Legal Institute defines Intellectual Property as: *any product of the human intellect that the law protects from unauthorized use by others.  The ownership of intellectual property inherently creates a limited monopoly in the protected property.  Intellectual property is traditionally comprised of four categories:  patent, copyright, trademark, and trade secrets."*

USSC ruled in *Food Marketing Institute v. Argus Media Leader* confidential information revealed as a public record retains full confidentiality. *{This defeats Defendants' attorneys assertions my IP "will become public through discovery" anyway, so they feel should not be dismissed as counsel.}* **(Exhibit J)** My name, address, and phone # are revealed in my trademark application. I did not transfer my bundle of rights, confidentiality or legal authority to the public for use of my personal data, either. Public access doesn't mean public entitlement.  I complied with the federal and state securities laws requiring disclosure of confidential/proprietary content.  This requirement does not transfer rights. Defendants' counselors state a creator doesn't have copyright protections if absent a *specific* copyright application. This is patently untrue. The Digital Millennium Copyright Act and other laws verify publications to a publicly accessible website are copyright protected. Screenshots below counter Lathrop GPM's remarks. I have original work on my website, KansasFreedomFarms.com, with copyright-protected content Defendants believed they could use freely w/o compensation to me. My trademark application, LinkedIn profile (LI policy), digital work, and expressed trade secrets are all protected original work. This includes private correspondences with digital traceability, etc. I met the "*reasonable effort to protect*" my intangible property and related legal bundle of rights.

### Web Content and Copyright Law

Anything that enjoys copyright protection, whether it's rendered in ink or pixels, may not be copied or published elsewhere without the express (typically written) permission of the author. The information need not have a copyright notice or symbol associated with it to be copyrighted, since copyright protection arises as soon as an author creates an original work and fixes it in a tangible medium. The contents of a website are no different than the contents of a book or magazine in terms of copyright protection, even though web content is often seen as more "disposable" than works existing in a physical medium.

Also, any non-digital content that is protected by copyright law is automatically protected in its digital form as well. For example, a copyrighted novel published as a paperback will receive the same protection when it's published as an e-book. In addition to online content, databases (both electronic and paper files) also enjoy copyright protection as long as they show a certain degree of creativity by the author, such as in its organization or selection.

### Digital Millennium Copyright Act

A federal law passed in 1998, the Digital Millennium Copyright Act (DMCA), makes it clear that materials published on the Internet are protected by U.S. copyright laws. The law makes some exceptions that are specific to Internet law. Internet service providers can escape liability for infringing the copyright of materials that merely pass through their computers, for example in email messages. If an Internet service provider removes infringing material promptly upon request, it also can escape liability.

In this context, there are Federal and State securities laws enacted to protect the public from unscrupulous persons who may have ulterior motives that can harm the public financially and otherwise. I complied with securities laws. I provided candor, facts, supportive disclosures, and transparency so audiences could make informed decisions based on accurate assessments.

By the same token, there are Federal and State laws that protect authors of original work, inventors, entrepreneurs and patent applicants from unscrupulous persons who may have ulterior motives that can harm the creators of proprietary work designed to provide benefits to people.

The "K-State 105" project is substantially similar to mine and taken therefrom to make a derivate. As author-designer, I upheld my side of legalities.  Defendants did not.  To validate my position on copyright protections plus how Defendants' counsel, Lathrop GPM, is **_incorrect_** in its reply. I have provided a screenshot of search results for "Lathrop GPM" on the Federal Government's official copyright website using a Copyright.gov search tool. Lathrop GPM isn't a registered mark (**below**). However, Lathrop GPM has earned copyright protection for its own original work (website content).

Oakwood Laboratories LLC v. Thanoo, **No. 19-3707 (3d Cir. 2021)** supports my position too. Defendants are illegally using my copyright-protected content as well as the trade secrets therein. *The "use" of a trade secret encompasses <u>all</u> the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or for an <u>exploitative purpose, such as research or development</u>."* "*A trade secret plaintiff need not allege that its information was the only source by which a defendant might develop its product.*" '*Defendants avoidance of costs Plaintiff invested to create trade secrets constituted harm.*'
The following page further substantiates my claims Defendants misappropriated my original work.





This is a screenshot of Lathrop GPM's website and copyright mark that is **not registered** at above:

Why would IP attorneys put a copyright trademark on their homepage for a public notice of legal copyright protections when they don't possess such "official" copyright registrations for it? Given Defendants and their attorneys stated they believe an IP creator's content posted to a gov't website (USPTO) compromises legal rights, anything I sent to Copyright.gov would be "fair game" to them. Adding more exposure of my IP on this site enables predators like Defendants to steal it.

Copyright protections/entitlements are provided for the authors/inventors of original work to include when published as part of the public record. Leading URL (Uniform Resource Locator) providers and website domain hosts like Amazon Web Services, GoDaddy, HostGator and others disclose in their terms and conditions those issues associated with copyright protection and possible infringements, etc. Federal laws clearly state original content is automatically copyright protected when a user of such services clicks "Publish" on a given domain registry (website). Even though the original work is now accessible to the public, its legal bundle of rights and other proprietary protections are NOT transferred to the public, any member of the public, or otherwise offered for indiscriminate use. Defendants violated these safeguards causing discernible damage. Images below are clear and convincing evidence that the Defendants are using my original work.

As noted, the USSC ruled copyright holders secure protections even if they misunderstand copyright laws *(UNICOLORS, INC. v. H&M HENNES & MAURITZ, L.P.).* **{Analysis Exhibit C)** Writing the majority opinion, Justice Breyer confirmed authors, content creators, and inventors' works are protected in spite of whether they are factually perfect. Trademark registration fits this parameter.

### Kansas State launches statewide partnership to leverage expertise in economic development

Underlying goal of land-grant university: 3,000 jobs, $3 billion investment by 2030

BY: TIM CARPENTER - JANUARY 17, 2023   12:08 PM



Steve Radley, NetWork Kansas, announces details of the K-State 105 initiative at an event in Topeka; photo by Matthew

TOPEKA — Kansas State University launched a project to expand upon the traditional land-grant mission by aggregating entrepreneurial expertise to accelerate growth of business startups and existing companies in communities throughout the state's 105 counties.

K-State president Richard Linton said the work would mesh with the university's plan to create in Kansas 3,000 jobs and attract $3 billion in investment by 2030. This represents KSU's response to a push by the Kansas Board of Regents to make state universities more robust drivers of economic activity. The university announced the "K-State 105" alliance with the nonprofit NetWork Kansas to give rise to a statewide economic development apparatus providing business owners with better access to expertise, education and economic resources.

"This initiative is truly reflective of K-State's land-grant mission to build, support and improve Kansas communities and aims to improve the lives of all Kansans," Linton said. "We firmly believe that if civic and community leaders are committed to locally driven growth strategies and are connected to a broad range of technical, business and support services, all communities can grow and thrive."

Linton said KSU's statewide extension service obligations in each county meant the university was "impeccably positioned to be a leader in strengthening and building new relationships."

The entrepreneurial effort would seek to meet community needs tied to access to capital, childcare, housing, infrastructure and technology, he said.

Steve Radley, chief executive officer of NetWork Kansas, said 98.6% of Kansas businesses had less than 100 employees and those companies represented two-thirds of all jobs in the state. The statistics illustrate the imperative of shaping economic development activities to meet local community challenges, he said.

"If you think entrepreneurship isn't important," Radley said, "then you're in the wrong state. Entrepreneurship and small business is the lifeblood of the state."

K-State and NetWork Kansas recognized the distinction between needs of urban and rural counties by engaging in partnership agreements with the local economic development agencies Go Topeka and the Northwest Kansas Economic Innovation Center.

The US Supreme Court (USSC) decided the Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith case. Justices ruled 7-2 in favor of plaintiff alleging copyright was infringed when an artist merely used the likeness from a 1981 picture of Prince (deceased musician) and reimagined it using various effects to *__resemble (but not replicate)__* the original pic. Goldsmith used the image to create silk screens. Justice Sotomayor wrote a majority opinion saying **authors of original works are**

afforded protections to originals as well as "*rights to derivative works*" if the latter "shares substantially the same purpose, and the use is of a commercial nature." The USSC did ***not*** separate intangible works from tangible works for copyright safety.  Original work posted to a website is protected as is info disclosed in confidence that becomes a matter of the public record (Food Marketing Institute v. Argus Leader Media 2019).  My IP (copyright-protected content, trade secrets, and original work) is fully protected by federal law (even in discovery) to include derivatives others may contrive from it.  The USSC ruling says, '**substantially the same**' to an original.  It ***doesn't*** say nearly identical to the original work.

**Coda Dev v. Goodyear Tire & Rubber Co (2021)** supports my position, also.  **(Exhibit C cont'd)** A jury awarded Coda $64M after the groups discussed self-inflating tire technology Coda created. Coda offered alliance with Goodyear only to have defendant misappropriate plaintiff's IP. My case is like that one.  Defendants stole my IP after offers to share. "K-State 105" *is* my hijacked IP.  I've spent about 7 years creating, fostering, and protecting my IP only to suffer Defendants' theft.  The U.S. Supreme Court ruled in Life Spine, Inc. v. Aegis Spine, Inc. ('23) information submitted for a patent qualifies as a ***trade secret*** and retains protections. Trademark app. content is protected (text on a page), too.  Kansas laws do not require complete secrecy of trade secrets or copyrighted content…merely reasonable efforts to protect.  Assessment Tech Institute, Inc. v. Cathey Parkes (2022)

In regard to President Linton's remarks on 01/17/23, they beg many questions including an obvious one, "Since when did an ag college or univ. foundation (NFP in voluntary sector) get into private construction, **comm'l real estate dev. (pg. 14 KSU document)**, owning childcare facilities, building single-family/multi-unit residential assets in other-than-home-county locations, installing infrastructure, producing energy, retail food production, broadband installs (**pg. 14 KSU document**), sewer systems, retail goods and services statewide, and/or raising capital for private ventures?"

One Defendant, Network Kansas, claims no involvement of the misappropriation of IP, TS, CC or any participation in tortious interference, cybercrimes, and/or other allegations.  Below are just three screenshots of ***many*** private, protected communications **dating back to 2017** where Defendants and staff are receiving and responding to my inquiries. These and other traceable communications will verify this Defendant was well aware of my endeavors and interfered. The fact a Network Kansas logo is featured on the backdrop behind Dr. Linton supports this assertion.

Defendants leading rural economic development agencies, who are fiduciaries, became privy to my trade secrets, copyrighted content & internal info via req'd disclosures. They colluded w/the KSU Foundation, Kansas State University, and others to enrich themselves at my expense. Protected documents and communications submitted in discovery will corroborate my allegations.




Incriminating messages verify my allegations. Discovery will reveal more digital evidence. Questions arise:  "When did K-State become a broker-dealer and/or investment advisory firm like Merrill Lynch?" "Why did K-State write new joint venture edicts **recently**?"  (**pg. 14 KSU document**)

IRS agents and jurors may ask, "Don't startup risks and launching ventures in distressed rural areas violate the highly conservative investment restrictions that university foundations and similar charitable organizations have by their own covenants…not to mention similar regulatory restrictions imposed by the Internal Revenue Service, Securities & Exchange Commission (SEC), and Kansas Dept. of Insurance/Securities (KDI) in respect to our Blue Sky laws?"  I fully complied w/disclosure requirements and registration for Reg D, 506(b)(c) exemption. Defendants didn't and breached ethical/legal restrictions to my protected, original work to enrich themselves unlawfully.

Citizens must ask, "Why is K-State starting **another** group of 105 offices in the state when they already have one in every county that we taxpayers fund to serve the Land-Grant mission?" The private sector must ask why KSU went to the Legislature ('23) to request $10M in funds to start the **for-profit** "K-State 105" business plan to compete w/the private sector. (?)  I submitted confidential, proprietary info to the Dept. of Commerce for the STAR Bonds program, BASE Grant ($100M fund) and BASE Grant 2.0 ($50M). **KDOC rejected my requests**. Legislators granted KSU's request for $10M so Defendants could recruit, hire, and deploy for "K-State 105" that is "substantially similar" to my copyright-protected content, trade secrets and, effectively, is a **derivative** originating from my self-authored business plan(s) and my other original literary work whether intangible or tangible. This implicates Gov. Kelly's Administration. The breaches include IP for novel K-12 and tech/workforce dev. KSU now calls Pre-College pathways. **(Exhibit K)**  Why would an ag college or university endowment focus on creating K-12 curricula?  The Kansas Tort Claims Act does **not** grant immunity for illegal activities. (**Exhibit L**) I met w/State Rep. Les Mason (R-73) on 7/12/23 to discuss Defendants' statements that KSU reps. offered during appropriation requests.  Rep. Mason serves on the Appropriations Committee.  He and I discussed ministerial tasks **(Exhibit M)**, too. Mr. Mason also followed up with the KBI in regard to my **_criminal complaint_**.

Lt. Gov. Toland and/or Defendants weren't functioning within customary scopes when they misappropriated my property. Mr. Toland doesn't have discretionary authority to infringe protected IP …and committed tortious interference by *deploying mine*. Lt. Gov. Toland has an Oath of Office, Code of Ethics, employer agreement, and fiduciary capacity to uphold in ministerial functions. As Lt. Governor and Secretary of Commerce, Mr. Toland violated them by implementing an action that is justiciable. Kansas Statute 44-130 disallows State employees from acquiring rights to trade secrets he/she did not personally develop exclusively on his/her own time. Mr. Toland, the KSU Foundation, KSU, and co-defendants did not develop the Intellectual Property (IP), Trade Secrets (TS) and Copyrighted Content (CC) *at all…*let alone on their own time. This adds to my position that the *Defendants went beyond customary scopes for financial gains*. Defendants are unlawfully using my trade secrets and copyrighted content (CC) to build economic gains unjustly at my cost. The Eleventh Amendment per Scheuer v. Rhodes 416 US 232 ('74) prohibits absolute immunity. Lt. Gov. Toland and Defendants have *no immunity* by way of the proprietary function test, as well.

I have substantial support for my claims including digital evidence like (but not limited to) a plethora of private, protected communications, documents, and testimony with timelines. I have solid evidence of originating my IP, mktg. efforts, customer lists, target sites, and novel acumen. I created (original work) the IP in question elected officials + authoritative constituents will verify.

My private, proprietary trade secrets include very intricate financial stratagems. Defendants admitted they were wholly unaware of nearly all aspects, benefits, creative financing, lending leverage, tax-equity financing, subsidies that can be "stacked" instead of negating one, the other, or both, and the sophisticated, new approaches I personally ideated and explained in confidence.

The KSUF letter on 8/23/2018 confirmed my advanced, rare, and refined knowledge of many gov't subsidies, lending programs, tax incentives, and write-off allowances across multiple financial programs were also "too complex" to Defendants.  KSUF was clearly so *unfamiliar* with my self-developed, new methods to apply, leverage, and maximize a multi-faceted consortium of monetary resources with unique partnership agreements they wrote me a letter to fully disengage and declare my IP was wholly proprietary. To further demonstrate KSUF's lack of expertise in the areas I presented, they insisted on an IRS Comfort Ruling from me. As the letter states, even if I provided Foundation such ruling, they still were not comprehending or believing my original work as viable. The collective didn't grasp design-build models (trade secrets), connecting unalike industries' methods into hybrid operations (trade secrets), or my comprehensive integration of initiatives. My tactics include first-ever vertical and horizontal manufacturing sourcing & outputs, blended alternative and conventional energy production, etc.  KSUF didn't understand any of it.

As author, I took exhaustive measures to prove my efforts and conclusions (trade secrets) were correct, suited to my proposals, and were superior to industry experts' beliefs across several categories such as accounting, banking, construction, energy production, food production, job creation, rural development, and sustainability techniques that are novel to the respective spaces.

Discovery will clearly reveal I'm in possession of a plethora of documents, emails, industry brochures, and regulatory language that is either incorrect, intentionally misleading, or general knowledge that is less desirable/profit enabling than my seminal know-how. **(Exhibit M for some)**

Discovery will show I met in person and/or communicated directly with people who hold elevated positions in their industries and are widely regarded as experts in their fields. He has many private emails and pertinent documents that will illustrate how my new approaches to financial components related to creating economic prosperity across Kansas and other states are exceptionally valuable, contrary to general knowledge, and transformative (trade secrets). I will submit evidence and call witnesses who are prominent elected officials, accomplished professionals with desirable credentials, and technical experts to support my original work. These astute people will explain to the Court and jury why my work is truly unique. **(Exhibit N for some)** I possess a vast amount of protected communications to/from elected officials, experts in subject matters, and witnesses privy to critical facts of this case who may seek Whistleblower protection.

During discovery, I will submit confidential email records, calendar events, and protected conversation notes backing my arduous and lengthy efforts to bring my IP and unique, valuable vision to reality in KS and potentially other states. Defendants interfered in those jurisdictions, too.

I verify my allegation of economic espionage with facts related to Defendants' own exhibit (14-page pamphlet) that declares their "economic prosperity plan" will start global and interstate commerce, which meets "commercial activities" definition in violation of IRS limits in scope for 501(c)(3) entities and the Economic Espionage Act §1831-1839 (foreign, interstate commerce). Defendants' for-profit ventures violate my trade secrets to include misappropriating my customer lists, contacts, deployment, financial conjoining, goodwill, marketing, public relations, real property targets to develop, tax benefits, sustainability ventures, and my customer lists (trade secrets) for off-take prospects including gov't agencies. My customer lists are IP. {Morlife Inc. v Perry (1997)}.

Particular manufacturing details that are not publicly available often qualify as protectable subject matter. For more on this, see *Gates Rubber Co. v. Bando Chemical Industries Ltd.*, 9 F.3d 823 (10th Cir. 1993).

Remedies

Remedies will vary depending upon the state, and whether the Economic Espionage Act is involved.

Under §1832(a) of the Economic Espionage Act, misappropriating a trade secret used in interstate commerce or foreign commerce may result in fines or imprisonment.

As an example of enforcement under the Uniform Trade Secrets Act, under Texas's adoption of the Act, a plaintiff who files for a preliminary injunction only needs to show that the defendant possesses the subject matter in question and has the opportunity to use it. This was confirmed in heard in *Hughes v. AGE Industries Ltd.*, which was decided by the Texas Court of Appeals.

I can cite a multitude of trade secrets Defendants stole that fit the legal definition found in the Uniform Trade Secrets Act (UTSA) for such as published here from the Cornell Legal Institute:

The USTA defines a "trade secret" as:

- "information, including a formula, pattern, compilation, program, device, method, technique, or process that:
  - Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
  - Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Speaking of government agencies being part of my protected customer list (trade secret), I had a face-to-face meeting with the Fmr. Acting Undersecretary of the Navy (18th) four years ago. I met Rear Admiral Gregory J. "Greg" Slavonic (Ret.), on **27 June 2019, @ 1100** hrs at his office in the Pentagon. We discussed transformative uses of my IP to benefit the US military whether at home or abroad. Confidential talks included how to design, build, own, operate, and systemically improve production of food, water, and energy (FEW) at the US Naval Academy in Annapolis, MD as well as along shorelines from which naval vessels depart. Manufacturing processes, financing niches, physical sites, functionality, logistics and tax law nuances are trade secrets we discussed.

Some of the economic, operational, and tactical upsides (trade secrets) that I shared with Rear Admiral Slavonic were the facts my IP created new ways to provide natural foods, purified water, clean energy, storage of various resources, as well as reliable security thereof.  I illustrated in confidence how food production facilities by a coast could be designed, engineered, equipped, managed and supplied with sustainable resources that could be delivered aboard ships within minutes of readiness.  Rear Admiral Slavonic and I discussed how a state-of-the-art food creation and custom packaging facility that operates off-grid with decentralized data control (trade secrets) can better optimize feeding servicemembers, staff, and families with lower costs. The discussion included how Rear Admiral Slavonic's alma mater, Oklahoma State University, could be a potential Land-Grant partner given K-State's flat denial of viability and firm skepticism. President Linton's press conference created catastrophic damage to me across other states like Oklahoma.

Rear Admiral Slavonic and I explored how my work (copyright content/trade secrets) could be effectively and efficiently deployed to military installations as well as international duty stations (fixed or temporary) including tactics that create combat advantages. Talks included how my IP could be used at Ft. Sill, Ft. Riley, McConnell AFB, Ft. Leavenworth, the USNA and other locales.

Some secretive strategies + tactics are in my 200-page business plan, 100-page marketing plan (literary work), as well as my noted 157-page slide deck (PPT) shown to KSU/KSUF. Within said, I crafted "serenity employment" roles for PTSD victims w/focus on helping America's combat Veterans. I'm an honorably-discharged Vet. I designed tie-ins to train the incarcerated and those recently released.  I crafted novel nuances (trade secrets) to ownership options, managerial roles, and entry-level duties that develop workforces and empower the disadvantaged in high-tech jobs. Defendants poached my initiatives for self-benefit causing damages to me across jurisdictions.

I provided confidential, protected info to Defendants as part of required disclosures when soliciting private offerings that included content and novel software applications (trade secrets). New apps, codes, and software (literary works) my professional IT specialists will produce create economic, marketing, social, cultural, and operational upsides (trade secrets).  Intangibles include interdisciplinary elements in the education, economic, energy, food production, healthcare, research, retail consumerism, transportation, and other industries…all of which meet the legal definition of trade secrets. Defendants have knowingly and intentionally misappropriated said. Discovery will reveal Defendants are illicitly leveraging them and renaming them to be deceptive.

One example is my novel proposal to create "Pre-K3 to PhD" custom education programs that can be offered in host communities + online for accessibility and affordability. Students can attend higher ed. "ag tech/micro campus" (real property) in any 105 KS county without having to relocate. My new curricula offers prof. certifications/vocational skills. My plan to mesh K-12, higher ed and continuing ed as stackable credentials are trade secrets. KSU took my trade secret and carved a *derivative* "Town to Gown".  My original work for new K-12 education strands and software (codes) to support them are also my trade secrets.  KSU's pamphlet cites them (pg. 7). I created "rewards" programs tying  academic achievements (PK-PhD) with consumer incentives. My plan to create on-site classrooms, virtual learning, and interactive experiences in 105 counties with a major university (possibly using new ag ext. offices to host) are mimicked in KSU literature.

I request to submit some evidence to the court in a sealed format rather than as exhibits given Defendants' ruthless disregard for Federal/State laws prohibiting misappropriation. I remain certain judicial officials and appropriate constituents will recognize the confidential, vulnerable, precise nature of my original work and justly seal such records as it deems fit.  Kansas law states:

{2011 Kansas Code Chapter 60. – Procedure, Civil, Article 4. – Rules of Evidence 60-432 Trade Secret}

"**The owner of a trade secret has a privilege, which may be claimed by the owner or his or her agent or employee, to refuse to disclose the secret and to prevent other persons from disclosing it if the judge finds that the allowance of the privilege will not tend to conceal fraud or otherwise work injustice.**"

I believe my case has broad implications of great magnitude given research underwriters, including government agencies at all levels, will be keen to what transpires. Those who provide research funds, grants, corporate support, and other forms of underwriting to higher education institutions such as Kansas State University, will contemplate if publicly-funded entities can or can't be trusted with Intellectual Property (IP) like Trade Secrets, Copyrighted Content (CC), and/or patents (P) that researchers come into the possession of whether legally or illegally. I have bona fide concerns Defendants' breaches of the public trust and a private citizen's ability to create original work to benefit society and be compensated for it may have catastrophic consequences to our citizenry, businesses, insurance underwriters, the State of Kansas, and our country.

My constituents and I have discussed and explored the damages to me and my endeavors as well as the collateral damage Defendants caused by publicly announcing trade secrets and business opportunities I established and was retaining in confidence.  My trusted advocates and supporters are world-class experts in agriculture, consumerism, education, energy, engineering, finance, int'l commerce, real estate, planning and zoning, taxation, vertical farming, and other professional sectors that lend to my authentic development of a plausible, well-thought-out group of "ag tech campuses" that are the basis of new real property projects and statewide prosperity. Defendants violated copyright laws as described in a "Four Factor Test" to supplant all 105 of my scheduled real estate projects to start their derivative statewide network of commercial entities.

Defendants misappropriating my intangible assets and relationships raise concerns.

Three (3) questions the public and private sector will surely have are:

1. "Why would any org./person trust K-State when it stole Mr. Geist's Intellectual Property…especially after K-State said it was "unproven" only to use it for comm'l gains?" *(enter private sector marketplace)*

2. "Why would anyone give K-State research money or ideas to explore if KSU is going to turn around and steal the value created or use taxpayers' money to cheat others out of their rightful shares?"

3. "How can we trust the Kelly Admin. when people like Mr. Geist submit confidential, proprietary information to it for bonds, grants, and other subsidies only to be rejected while the Lt. Governor proceeds with plans (alongside K-State) to use State funds to benefit from the secret, stolen data?"

I reiterate my claim Defendants misappropriated Intellectual Property (IP) including but not limited to trade secrets, copyright-protected content, customer lists, financial data, etc. Noted in original petition is the fact salient points of a statewide network of 105 comm'l real properties to join admin., cyber/data, financing, housing, operations, marketing, and revenue become protected work as I fixed said to tangible media of expression (descriptive service mark, PPT, website, etc.). The "K-State 105 economic prosperity (business) plan" doc evasively alludes to a lot of my ideas.

Defendants clearly stated in the KSUF 8/23/18 letter my Intellectual Property is *unique*. The same KSUF letter declares my hybrid, intertwined, and customized methods were notably far "too complicated" and "unproven". Without question, this confirms my properties' exclusivity (trade secrets).  Further, my inventive operating model to create rural food security through sustainable resources interwoven with novel approaches to education, research, and resources management creates proprietary economic advantages using methods that are clearly not generally known or easily accessible.  My blended expertise across industries enables me to develop diverse original work. SEC regulations require me to disclose salient points and general foundation for investment solicitations. Defendants have my confidential cost estimates, financial pro forma, rev. forecasts, design-build images, function upgrades, and quality/safety standards that offer economic value.

Third-party experts assessed the fair market value (FMV) of my planned enterprises in KS (alone) to merit $5.0B+ in investment funds leading to a conservative estimates of $50B in FMV within the next generation. Defendants said at the press meeting and in published info (exhibit) "K-State 105" real property dev. plans (business plan) was worth **$3.0B** in fair market value (FMV). I lowered my actual damage relief request from third-party experts $5.0B estimate to Defendants $3.0B appraisal to resolve the case using Defendants valuation. As such, Defendants and I agree to $3.0B as compensatory damage. I defer to the Court/jury for punitive awards. If Defendants invoke eminent domain, we agree to $3.0B as compensation w/o notice or due process. **(Ex. O&P)**

Defendants had incalculable chances to procure licensing rights, propose joint ventures, write agreements (proposals), forge a partnership, or similar.  Defendants had many chances to mediate, negotiate, or otherwise submit proposals to lawfully possess and deploy my IP, etc. They chose not to.  Defendants intentionally, knowingly and willfully broke Federal & State laws to gain economic advantages for themselves at my enormous expense.  Discovery will validate my well-founded allegations and reveal Defendants' numerous appalling breaches of the public trust.

In support of my position, Defendants had ample remedies to lawfully use my protected IP, a University of Texas law school class studies a paper written by John F. Duffy published in the Texas Law Review related to IP and natural monopolies.  Mr. Duffy writes Intellectual Property is aligned with natural monopolies that can be materialized and ultimately integrated for the public good.  To do so, there are sufficient means for beneficiaries, investors, stakeholders and others to ally with the inventors of intangible property and the bundle of rights assigned and protected. Mr. Duffy's 35-page analysis suggests more regulation is necessary to protect creator's rights while enabling more streamlined paths for utilization. Otherwise, IP theft (like this case) will be rampant.

I must underscore securities laws exist to protect the public from bad faith actors who may try to raise capital or resources from would-be investors. I complied with our laws.  Our nation has Intellectual Property (IP) law to protect creators of original work from bad faith actors who misuse intangible, valuable assets to be enriched at creator's cost. It is obvious Defendants neglected "Safe Harbor" laws (DC Comics v Towle '15) when misappropriating my IP to my extreme detriment. US Court of Appeals for the Ninth Circuit Judge Sandra Segal Ikuta opined while quoting Batman, "In our well-ordered society, protection of private property is essential."  *(DC Comics v. Towle* 2015) Judge Ikuta's opinion supports the United States Supreme Court's rulings that protect proprietors.

I fully embrace biblical teachings and a Christian worldview. I find wisdom in the Bible and instructions for life. Saul of Tarsus transformed into Paul the Apostle (Acts 8:3). I live to transform people and places from "old" to new".  I often cite 1 Cor. 3:7, Rom. 12:2, and Daniel 7:26-27 as inspiration for using my God-given gifts to enrich lives.  Defendants had to make ethical, moral, and spiritual choices after learning of my IP.  They chose to violate manmade *and* spiritual laws.

I ask the Court to deny all motions to dismiss with prejudice.  Defendants are not immune. They began for-profit endeavors.  Further, as applicable, I move for preliminary injunctive relief to prohibit Defendants from advancing the *derivative* "K-State 105" economic prosperity plan and/or all efforts related thereto until this case has reached its final resolution.  Further, as the movant, I ask the Court to require the Defendants to disclose all funding sources, contact information, and amounts committed, pledged, or likely to commit to any/all economic prosperity plans and/or anything related to "K-State 105" with all funds held in escrow as the Court deems proper.  When appropriate, I'll ask the Court to receive my business plan(s), data, marketing plan(s), and other sensitive info as exhibits/evidence under seal to reduce the possibility of further misappropriation.

Lastly, Defendants stated this matter was a federal question and demanded it be heard in a federal court. Therefore, the Supremacy Clause should govern this case.  Many recent USSC rulings in like cases have established precedence.  Said decisions adamantly support my position. I believe a jury will agree and, based on a preponderance of evidence, find all Defendants guilty.

Respectfully submitted this **8th day of Sept. 2023**.

**From the Plaintiff Pro Se**

**Forrest L. "Lenny" Geist**

**ORIGINAL FILED** with the Clerk by email this **8th day** of **September 2023**.

Defendants' and/or counsel noticed by electronic communications (emails) simultaneously.

28

# EXHIBIT A

It is my position Lt. Governor Toland and other Defendants who are desperately hoping to claim sovereign immunity as their defense have ***both involuntarily*** as well as ***voluntarily*** given up such exemption in this matter.  All Defendants fail the "Four Tests" **(Exhibit J)** for involuntary surrender of sovereign immunity.  In clear companion thereto, Defendants ***gave up all immunity when going beyond conventional and/or public scopes to willfully enter our free market spectrum, etc***. ==Defendants are misusing public funds and abusing fiduciary roles== to serve the public by **entering into the private sector to compete economically**. This is a <u>**voluntary renunciation**</u> of immunity afforded some elected officials &/or public agency roles in order to <u>pursue commercial undertakings</u>. This constitutes a clear breach of public trust, tortious interference, & conspiracy when <u>they colluded to commit crimes</u>.



ECONOMY > ECONOMICS

## What Is the Private Sector? Definition and Business Examples

By THE INVESTOPEDIA TEAM  Updated June 19, 2023

Reviewed by THOMAS BROCK

Fact checked by MARCUS REEVES

**Private Sector**

[ prī-vət 'sek-tər]

The part of the economy that is run by individuals and companies, often for profit, rather than a government.

Investopedia / Joules Garcia

## What is the Private Sector?

The private <u>sector</u> is the part of the economy that is run by individuals and companies for profit and is not state controlled. Therefore, it encompasses all for-profit businesses that are not owned or operated by the government. Companies and corporations that are government run are part of what is known as the public sector, while <u>charities</u> and other <u>nonprofit organizations</u> are part of the <u>voluntary sector</u>.

## The Bottom Line

The private sector is the part of the economy that is not run by the government. It comprises the businesses and enterprises that are controlled by private individuals and groups for the purpose of making a profit. Companies and organizations run by the state are considered to be the public sector. In free market, capitalist-based societies, the private sector tends to make up a considerably larger portion of the economy than the public sector.

# EXHIBIT B

**PERKINS**COIE
COUNSEL TO GREAT COMPANIES

Professionals   Services   News & Insight   About Us

Home › News & Insight › $8 Million Trade Dress Infringement Verdict: Is Your Trade Dress Protected?          EMAIL • PDF • PRINT • SHARE

## $8 Million Trade Dress Infringement Verdict: Is *Your* Trade Dress Protected?

A recent $8.1 million verdict in a trademark and trade dress infringement action is an emphatic reminder that businesses of all sizes should protect their trade dress as well as their trademarks. Although smaller or startup companies may view trade dress protection as an unnecessary expense, this stunning victory over a much larger opponent illustrates the value of robust trademark and trade dress protection and enforcement. In this case, Mixed Chicks LLC introduced a unique line of hair products for multiracial women and had the foresight to federally register the MIXED CHICKS trademark. Mixed Chicks' packaging design also was unique: translucent bottles and pumps, different colors for different products and prominent orange lettering on the bottles.

After Mixed Chicks declined to sell their products to Sally Beauty Supply, a hair care retail giant with 2,700 stores, Sally Beauty Supply introduced a "Mixed Silk" product line with translucent bottles that were exactly the same shape, carried the same orange lettering and contained product contents of the same color as Mixed Chicks' bottles. *{Note: Plaintiff and Defendant didn't reach a licensing deal, so defendant created a derivative illegally.}*

Mixed Chicks' federal court action for trademark and trade dress infringement resulted in a jury verdict of $7.3 million in punitive damages and $840,000 in actual damages. After the verdict, Sally Beauty Supply offered to settle for $8.5 million, exceeding the jury award in order to avoid paying Mixed Chicks' attorneys' fees and costs.

Arriving on the heels of Apple's *billion*-dollar victory against Samsung Electronics for infringement of the iPhone® design, this is the second verdict in a brief period of time to base a large monetary award primarily upon trade dress infringement. In short, these verdicts illustrate the value of protecting and enforcing trademark *and* trade dress rights, including product configuration and packaging. *{Note: Real Estate Configuration/Features, etc.}*

Below are some "take-away" lessons from these cases:

**Always Register Trademarks:** Registration is an easy and cost-effective way to put your business in the best possible position in the event of litigation. Federal registration provides a presumption of validity of the trademark and a presumption that the infringer had notice of your rights, as well as access to federal courts. Therefore, a federal registration streamlines and reduces the cost and uncertainties of litigation.

**Trade Dress Matters:** Judges and juries don't consider claims in a vacuum. The MIXED SILK mark might have been viewed as sufficiently dissimilar to MIXED CHICKS to avoid an infringement verdict, but the stronger claim of trade dress infringement undoubtedly "spilled over" and tipped the scales on the trademark claim. Therefore, companies should consider—even before a product is "off the drawing board"—all available IP protection, including whether a product or product packaging have a shape, color and/or nonfunctional characteristic that could be the basis for trade dress protection.

Contact counsel to identify and develop effective strategies for registering and protecting your trademarks and trade dress, as well as other intellectual property.

# EXHIBIT C

## 2022 Year in Review: Intellectual Property Law and the Supreme Court

2022 was a quiet year for the Supreme Court in terms of intellectual property (IP) rulings.

### The Lone Opinion

***Unicolors, Inc. v. H&M Hennes & Mauritz LP:*** In the only IP-related petition to obtain an issued ruling in 2022, the Supreme Court helped copyright holders avoid invalidation of their copyrights due to inadvertent mistakes in their copyright applications.

Under a provision of the 2008 PRO-IP Act, the Ninth Circuit reversed a nearly $800,000 infringement verdict because it found that Unicolors' copyright registrations included errors, which the court found Unicolors knew were inaccurate. The Supreme Court reversed the Ninth Circuit's ruling and sided with Unicolors' argument that inadvertent legal misunderstandings were not the type of inaccuracies with which the law was concerned.

The Supreme Court noted that "it would make no sense if [the law] left copyright registrations exposed to invalidation based on applicants' good-faith misunderstandings of the details of copyright law." The Supreme Court then held that because the Copyright Act does not distinguish between a mistake of law and a mistake of fact, "[l]ack of knowledge of either fact or law can excuse an inaccuracy in a copyright registration."

## Recap of the Supreme Court's Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.

C-IP2  /  **March 15, 2022**  /

*The following post comes from Sabren H. Wahdan, a 3L at Scalia Law and a Research Assistant at C-IP2.*

 In one of his final majority opinions before announcing his retirement, Justice Steven Breyer penned a nuanced ruling that carefully threads the policy needle on copyright registration issues. The case pitted fabric designer Unicolors against fast fashion company H&M, but it was ultimately a victory for creators of art, fashion, music, dance, literary works, and others who rely on copyright registrations to protect their rights but lack the means to hire an attorney to ensure that their registration applications are legally and factually perfect. As a result of the ruling, they can register their works without fear that their registration could be invalidated by a good-faith mistake.

*Unicolors v. H&M* answers a narrow question of copyright law: what is the requisite level of knowledge to invalidate copyright registration? Justice Stephen Breyer's majority (6-3) opinion holds that actual knowledge of either a factual or legal mistake is required before a registration is invalidated. This makes good sense because copyright registration applications are often completed by creators who are not lawyers. Some background on the case is useful.

# EXHIBIT C (cont'd)

- *Coda Development SRO v. Goodyear Tire & Rubber Co.*, No. 5:15-cv-1572 (N.D. Ohio Sept. 19, 2022), in which the jury awarded Coda Development $64 million for the misappropriation of trade secrets involving self-inflating tires after Coda Development and Goodyear had discussed a potential collaboration;

Hrabal claims that he and his colleagues, using a PowerPoint presentation (*see* Doc. No. 223-20 at 6 (citing Doc. No. 240-23, PowerPoint Presentation on SIT (1/15/2009))), gave "a multi-hour presentation" that "included the following topics: where in the tire a pump could be located; how the pump should be built and designed; the pressure management systems that could be employed (regulator with dead space or recirculation with a three-way valve); how efficiently the pump could compensate for the tire's typical leakage; marketing strategies; Coda's strategic position and plans for further technical and business development, and Mr. Hrabal's testing of his prototypes." (Doc. No. 223-20 at 6; *see also id.* at 7–21 (describing each topic in detail).)

According to Coda, at the conclusion of the second meeting, Benedict asked to speak privately with his team in the meeting room with the prototype—a request that was granted. Unbeknownst to Coda at the time, Benedict then photographed the prototype and other Coda exhibits. (Doc. No. 244 at 21.)

When determining damages in an unfair trade practices case, the courts distinguish between the amount of proof needed to show "that some damages were the certain result of the wrong" and the amount of proof needed to ascertain the exact amount of damage. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 267 [66 S. Ct. 574, 581, 90 L. Ed. 652] ... (1946) (Frankfurter, J., dissenting on other grounds). The plaintiff is held to a lower burden of proof in ascertaining the exact amount of damages because, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.* at 265 *580 .

# EXHIBIT D

## The three (3) basic principles of the [Berne Agreement](#) are:

The Berne Convention deals with the protection of works and the rights of their authors. It is based on **three basic principles** and contains a series of provisions determining the **minimum protection** to be granted, as well as special provisions available to **developing countries** that want to make use of them.

(1) The **three basic principles** are the following:

(a) Works originating in one of the Contracting States (that is, works the author of which is a national of such a State or works first published in such a State) must be given the same protection in each of the other Contracting States as the latter grants to the works of its own nationals (principle of "national treatment") [1].

(b) Protection must not be conditional upon compliance with any formality (principle of "automatic" protection) [2].

(c) Protection is independent of the existence of protection in the country of origin of the work (principle of "independence" of protection). If, however, a Contracting State provides for a longer term of protection than the minimum prescribed by the Convention and the work ceases to be protected in the country of origin, protection may be denied once protection in the country of origin ceases [3].

[Bad faith actors](#) will look at this case and determine if the federal court is going to uphold law fairly for all US citizens or if such courts are going to enable bad actors to steal IP and benefit from crimes against private citizens while breaching the public trust in government.

Assuredly, bad actors like the Defendants will seize any decision that makes original works protected by IP laws (as well as tort laws) more susceptible to predatory plundering if fiduciaries and/or public agencies are allowed to violate law so irreverently for the sake of personal prosperity.

Without doubt, this case has state-level, nationwide, as well as international implications. As the US Supreme Court has wholeheartedly confirmed in recent decisions (including two in 2023 that were of 9-0 unanimity), the USCC and Constitution reassure and reinforce the legal bundles of rights novel thinkers and innovative, original contributors earned. If lower courts were to undermine clear legal precedence in such matters, it is rational and reasonable to conclude bad faith actors in Kansas, other states, and foreign countries will do the same. This would prove to be catastrophic.

Such charlatans will believe if K-State, the KSU Foundation, Lt. Gov. Toland, and economic/workforce development groups in fiduciary capacities can break multiple federal and state laws at the excessive expense of any citizen, group of citizens, or enterprise owners, they (charlatans) too can violate civil and criminal laws in order to capture gains given the legal precedence established.

Abroad, if they let Kansas do this to one of its citizens, we can do the same to US interests. This would be catastrophic to Americans' IP rights and our nation's cultural, political, and trade interests with foreign agents/countries. This case will be decided on facts and/or preponderance of the evidence that clearly supports the IP creator (Plaintiff). I feel a jury will side with me and uphold the law fairly while confirming elected officials and higher ed. work for the people…not vice-versa.

# EXHIBIT E





# EXHIBIT F



**Cornell Law School**

**L I I Legal Information Institute**

About LII ▶  Get the law ▶  Lawyer directory

LII > Wex > **fiduciary duty**

## fiduciary duty

Overview

When someone has a fiduciary duty to someone else, the person with the duty must act in a way that will benefit someone else financially.

The person who has a fiduciary duty is called the fiduciary, and the person to whom the duty is owed is called the principal or the beneficiary. If the fiduciary breaches the fiduciary duties, the fiduciary would need to account for the ill-gotten profit. The beneficiaries are typically entitled to damages.

Corporations and Fiduciary Duties

Directors of corporations, in fulfilling their managerial responsibilities, are charged with certain fiduciary duties. The primary duties are the duty of care and the duty of loyalty.

Duty of Care

The duty of care requires that directors inform themselves "prior to making a business decision, of all material information reasonably available to them."

See *Smith v. Van Gorkem, 488 A.2d 858 (1985)*.

Whether the directors were informed of all material information depends on the quality of the information, the advice available, and whether the directors had "sufficient opportunity to acquire knowledge concerning the problem before action."

See *Moran v. Household Intern. Inc., 490 A.2d 1059 (1985)*.

Moreover, a director may not simply accept the information presented. Rather, the director must assess the information with a "critical eye," so as to protect the interests of the corporations and its stockholders.

See *Smith v. Van Gorkem, 488 A.2d 858 (1985)*.

Duty of Good Faith

Under the duty of good faith, a corporation's directors and officers must advance interests of the corporation and fulfill their duties without violating the law.

See *In re The Walt Disney Co. Derivative Litig., 906 A.2d 27 (Del. 2006)*.

Duty of Confidentiality

Under the duty of confidentiality, a corporation's directors and officers must keep corporate information confidential and not disclose it for their own benefit.

# EXHIBIT F (cont'd)

## Sources of Fiduciary Duty

Foundations and endowments are typically structured as nonprofit corporations or trusts. The investment functions of most foundations and endowments are governed by state statutes based on model laws called the Uniform Prudent Management of Institutional Funds Act (UPMIFA), which applies generally to all entities, and the Uniform Prudent Investor Act (UPIA), which applies specifically to trusts.[1] The Acts impose fiduciary obligations on directors, trustees and managers which include:

| Fiduciary Duty[2] | Fiduciaries Shall: |
|---|---|
| **Duty of Care/Prudence** | Act in good faith, exercising the same care that an ordinarily prudent person in a like position would exercise under similar circumstances. Diversify investments, unless the purposes of the fund are better served without diversification. Take into consideration both general economic conditions and any asset's special relationship to the institution's charitable purposes. |
| **Duty to Investigate** | Make a reasonable effort to verify facts relevant to fund management and investment. This is often included as part of the duty of care. |
| **Duty of Loyalty** | Avoid self-dealing, misuse of funds and other misconduct. |
| **Duty of Obedience** | Perform duties with loyalty to the entity's mission and obedience to non-profit purposes.[3] This is often included as part of the duty of loyalty. |
| **Duty to Minimize Costs** | Incur only reasonable costs. |



---

**Cornell Law School**

**LII Legal Information Institute**                    About LII ▶  Get the law ▶  Lawyer directory

LII > Wex > **duty of good faith**

# duty of good faith

The duty of good faith is the principle that directors and officers of a corporation who are making decisions in their capacities as corporate fiduciaries, must act with a conscious regard for their responsibilities in that role. A violation of the duty of good faith may include an intentional neglect of the usual duties of a director or officer, intentionally acting for a purpose other than the benefit of the corporation, or intentionally violating the law. Though there is no private shareholder right of action for a violation of the duty of good faith, its violation may also raise a claim under the duty of loyalty.

In *Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank, 801 A.2d 1248,* the court held that "the duty of good faith has been defined as honesty in fact in the conduct or transaction concerned".

Furthermore, the Uniform Commercial Code section 1-304 provides that "Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."

# EXHIBIT F (cont'd)

**JUSTIA** US Law

Search

## 2017 Kansas Statutes
## Chapter 58 PERSONAL AND REAL PROPERTY
## Article 48 REVISED UNIFORM FIDUCIARY ACCESS TO DIGITAL ASSETS ACT (2015)
## 58-4815 Fiduciary duty and authority.

**Universal Citation:** KS Stat § 58-4815 (2017)

**58-4815.   Fiduciary duty and authority.** (a) The legal duties imposed on a fiduciary charged with managing tangible property apply to the management of digital assets, including:

(1)   The duty of care;

(2)   the duty of loyalty; and

(3)   the duty of confidentiality.

(b)   A fiduciary's or designated recipient's authority with respect to a digital asset of a user:

(1)   Except as otherwise provided in K.S.A. 2017 Supp. 58-4804, and amendments thereto, is subject to the applicable terms of service;

(2)   is subject to other applicable laws, including copyright laws;

(3)   in the case of a fiduciary, is limited by the scope of the fiduciary's duties; and

(4)   may not be used to impersonate the user.

(c)   A fiduciary with authority over the property of a decedent, ward or conservatee, principal or settlor has the right to access any digital asset in which the decedent, ward or conservatee, principal or settlor had a right or interest and that is not held by a custodian or subject to a terms-of-service agreement.

(d)   A fiduciary acting within the scope of the fiduciary's duties is an authorized user of the property of the decedent, ward or conservatee, principal or settlor for the purpose of applicable computer fraud and unauthorized computer access laws, including K.S.A. 2017 Supp. 21-5839, and amendments thereto.

(e)   A fiduciary with authority over the tangible, personal property of a decedent, ward or conservatee, principal or settlor:

(1)   Has the right to access the property and any digital asset stored in it; and

(2)   is an authorized user for the purpose of computer fraud and unauthorized computer access laws, including K.S.A. 2017 Supp. 21-5839, and amendments thereto.

(f)   A custodian may disclose information in an account to a fiduciary of the user when the information is required to terminate an account used to access digital assets licensed to the user.

(g)   A fiduciary of a user may request a custodian to terminate the user's account. A request for termination must be in writing, in either physical or electronic form, and accompanied by:

(1)   If the user is deceased, a certified copy of the death certificate of the user;

(2)   a certified copy of the letter of appointment of the representative or a small estate affidavit or court order, court order, power of attorney or trust giving the fiduciary authority over the account; and

(3)   if requested by the custodian:

(A)   A number, username, address or other unique subscriber or account identifier assigned by the custodian to identify the user's account;

(B)   evidence linking the account to the user; or

(C)   a finding by the court that the user had a specific account with the custodian, identifiable by the information specified in subparagraph (A).

**History:**   L. 2017, ch. 19, § 15; July 1.

# EXHIBIT G





# EXHIBIT G (cont'd)

## K·STATE
### Research and Extension

K-State home » Research and Extension » McPherson » Economic Development

## McPherson County

### Economic Development



A community's sustainability depends on it's long-term ability to meet residents' needs. One of our goals at K-State Research and Extension is to provide technical assistance and evidence-based programs to citizens who want to make sure their communities survive and prosper.

K-State Research and Extension can play a key role in helping people create a vision across traditional geographical, sociological, and political boundaries. As Henry Ford said "Coming together is a beginning; keeping together is progress; working together is success."

**Related Links**

- Kansas Pride Program
- Caring Works Website

**McPherson County**
600 W. Woodside
McPherson, KS 67460

Office: 620-241-1523
Fax: 620-241-3407
mp@listserv.ksu.edu

Kansas State University already has an ag extension office in each of the 105 counties with stated goals of "helping" people by providing technical assistance and evidence-based programs (research). KSU's scope is to "help, not heist" others' content, data, endeavors, intellectual property, trade secrets, or opportunities to prosper including Kansas Freedom Farms. Beginning the "K-State 105" initiative to "commercialize" opportunities with KFF's IP/TS/CC and Customer Lists are clear violations of federal and state laws. Defendants are beyond their admitted scopes using Plaintiff's confidential, proprietary information. The "K-State 105" leaflet states (page 8) the university plans to "enhance K-State's reputation for commercialization."

# EXHIBIT G (cont'd)





Defendants are limited in scope. They are fiduciaries who *support* commerce – not stealing from people or businesses whether established, start-ups, planned, or simply proposed. Economic dev. group defendants have a mission to <u>support, not steal</u> from proprietors.

# EXHIBIT H



The "K-State 105 Economic Prosperity (Business) Plan" repeatedly indicates the newly-launched initiative is purposed to be entrepreneurial, to commercialize current and future business opportunities, attract external investments, enrich corporate partners and stakeholders, and 'improve global trade through partnerships across campus and with hundreds of state and global industry collaborators.' With a $3.0B initial investment and very conservative estimates of said capital creating a $30B statewide network of assets, it is clear to Plaintiff and may also be to the Court and jury this profit-seeking endeavor violates IRS laws and public trust. The $3.0B capital raise dwarfs the university's endowment ($945M) that took over 150 years to reach. On page 10 of the "K-State 105" leaflet, the group alludes to "investments" multiple times (i.e., for-profit ROI).

# EXHIBIT I

**KANSAS STATE UNIVERSITY**
**FOUNDATION**

8/23/2018

Lenny Geist
Kansas Freedom Farms

Dear Lenny:

Thank you for taking the time to meet with myself and some of our Leadership Team at the KSU Foundation. We appreciated your sincere interest in partnering with K-State and learning about the unique concept you have devised to generate infrastructure support and potential revenue streams through private eco-farms under the Kansas Freedom Farms brand.

Please accept these observations and recommendations as guidance for what you are pursuing. First, a partnership of this nature would be completely dependent on the University's priorities and timelines with respect to new facilities or modernization of existing facilities. Meeting with them about their facilities priorities would be a first step. Second, the University would have to access the financial feasibility and risk of the scheme which is quite complex - any potential direct financial benefit to K-State relies completely on the discretionary decisions of a substantial number of individuals to achieve the tax credit infrastructure support and the viability of a niche market food production enterprise to generate potential revenue streams would need due diligence. Finally, the University's risk assessment of a partnership's impact on reputation and brand will need considerable legal, financial and statutory compliance review.

To be completely direct and transparent, our professional advice and counsel to the University from a fundraising perspective would be as follows:

Unfortunately, this is not a project we would be prepared to endorse and able to commit to at this time for a number of reasons.

- The impact and dollar amounts referred to in terms of a total project are rather ambitious without proof this works on a smaller scale;
- The time and resources it would take to promote such a project detracts from our core mission of raising direct philanthropic support for Kansas State University;
- The complexity of this tax credit scheme and overall transaction is not one we would be able to easily describe too, or encourage alumni and donors to participate in;
- The lack of a Private Letter Ruling from the IRS, specific to this scheme presents far too much risk to our reputation as a Foundation if participant's "tax credit contributions" are not ultimately accepted by the IRS. Opinions from tax attorneys or accountants confirming the scheme's analysis would not, alone, be adequate proof of viability.
- And the complexity of how the private/public relationship would work with the multiple LLCs and bank trust accounts in conjunction with our own accounting, compliance, and audit responsibilities.

# EXHIBIT I (cont'd)



**KANSAS STATE UNIVERSITY**
**FOUNDATION**

*BOLDLY ADVANCING K-STATE FAMILY*

We assume and trust that the slide deck you shared with us was developed as a "private and confidential" presentation exclusively for our conversation.  If that is not the case, we respectfully request that you completely refrain from using any and all references, in any promotional and informative materials you may have developed or shared with others, to Kansas State University, the KSU Foundation, the College of Agriculture, any employee of K-State or the KSU Foundation, and most importantly any of the University's alumni or donors who have not directly agreed to be so represented. It would be inappropriate to use the pictures, names and likenesses of any individuals or entities in your materials and presentations, and must be demanded that Kansas State University not be implicitly associated with this project going forward in any manner.

Again, we appreciate you bringing this opportunity to us, and wish you success in the future.

Best Regards,

Benjamin A. Johnson
Senior Director of Gift Planning
Kansas State University Foundation

43

# EXHIBIT J



intellectual property will be the subject of substantial discovery. Put differently, by bringing this case, Plaintiff has assured that the nature and substance of any relevant intellectual property (to the extent it is not already public), will become public through discovery. Thus, any information Mr. Randall received cannot be "significantly harmful" for these alternative reasons. As a result, Husch Blackwell should not be disqualified under Rule 1.18, which Plaintiff does not invoke in any event.

### III.   CONCLUSION

Plaintiff's three sentence argument that Husch Blackwell should be disqualified fails to state even a prima facie basis for disqualification, and the Court should deny it for this reason alone. Even if the Court proceeds further, however, Plaintiff is not a current or former client of Husch Blackwell, and even if Plaintiff was a prospective client, Husch Blackwell did not obtain confidential and "significantly harmful" information from Plaintiff as a prospective client. Therefore, there is no basis to disqualify Husch Blackwell, even if Plaintiff had sought to develop his arguments.

**This is patently untrue, also.**

---

Summarily, this Response ends where it began: Defendants feel original literary works in documents or found online have no legal rights, **safe harbor security**, or require compensation when derivatives are used for commercial purposes. Several recent Supreme Court rulings give clear and convincing strength to Intellectual Property (IP) owners and their rights to original work as well as derivatives of such work. "K-State 105" is a derivative of my self-written business plan + related IP Defendants willfully stole while disregarding integrity as well as the letter of the law.

# EXHIBIT K

## Director of Pre-College Pathways

**Department:** 3670085515 Salina Enrollment Mgmt

**Apply now**

**Job no:** 515742

**Employment type:** Staff Full Time (Unclassified - Regular)

**Location:** Salina, Kansas

**Worksite:** Hybrid eligible (partially remote, must reside in US)

**Categories:** Administrative / Professional, Communications / Public Relations / Marketing, Student Affairs / Services, Child Development, Community Development / Community Vitality

**Pay Grade:** 11A



**About This Role:**

Kansas State University's Aerospace and Technology Campus in Salina is seeking a dedicated **Director of Pre-College Pathways** to create and coordinate the K-12 education programs offered by the college. This position will facilitate the expansion of pre-college programs, aligning educational offerings and creating pathways across regional and nationwide ecosystems. In addition, the Director of Pre-College Pathways will establish and maintain strong relationships with high schools, industry partners, and

**Preferred Qualifications:**

- 5-7 years of secondary school experience highly preferred
- High school administration experience
- Master's degree
- Experience partnering with community colleges and technical schools
- Strong communication skills for effective internal and external relationship development.
- Self-motivated and detail oriented, able to work independently.
- Ability to work effectively with people from diverse backgrounds and educational experiences.
- Strong qualitative and quantitative analytic skills and experience using data to inform decisions.
- Evidence of effective budgetary management.

# EXHIBIT L

Cornell Law School

**L I I   Legal Information Institute**                    About LII ▸ Get the law ▸ Lawyer directory

LII > Wex > **sovereign immunity**

## sovereign immunity

Definition

The sovereign immunity refers to the fact that the government cannot be sued without its consent.

Overview

Sovereign immunity was derived from British common law doctrine based on the idea that the King could do no wrong. In the United States, sovereign immunity typically applies to the federal government and state government, but not to municipalities. Federal and state governments, however, have the ability to waive their sovereign immunity. The federal government did this when it passed the Federal Tort Claims Act, which waived federal immunity for numerous types of torts claims.

Various Considerations Related to Federal Immunity

Under the Feres Doctrine, those who are injured during their military service cannot sue the federal government.

Under the Westfall Act, federal employees cannot be sued for torts committed during the scope of their employment .

Citizens Suing Their Own State

When determining whether a citizen may sue a state actor (someone acting on behalf of the state: i.e. a state worker), courts will typically use one (1) of four (4) tests:

---

*Misappropriating a private citizen's Intellectual Property (IP) for financial gains for the state that a private citizen (the IP owner) was doing himself.  "Actor" tortiously interfered with citizen's (IP owner) ability to perform private work.*

**1. Governmental v proprietary function test  Was the actor functioning in a governmental fashion or a proprietary fashion?)**

   1. If the actor was performing a proprietary function (i.e. acting for financial gain for itself or its citizens; doing something that is not historically a governmental function; doing something that can be performed by a private corporation/contractor), then the actor is subject to liability

   2. If the actor was performing a governmental function (i.e. acting for the general public; doing something ordained by legislature; performing a historic gov function), then the actor is not subject to liability

**2. 2) Ministerial/operational v. discretionary functions/acts test (Was the actor performing a ministerial/operational task or a discretionary task?)**

   1. If the actor is performing a ministerial/operational action, then there is not immunity.

   2. If the actor is performing a discretionary action, then there is immunity.

**3. 3) Planning v implementational (Was the actor planning an action or implementing an action?)**

   1. If the actor's planning of policy results in harm, then there is immunity

   2. If the harm happens due to the government's implementation of the plan, then there is not immunity

**4. 4) Non-justiciable v. justiciable**

   1. If the action is justiciable under regular tort principles, then there is no immunity. If the issue is not justiciable under regular tort principles, then there is immunity.

46

# EXHIBIT M



One example of the Lt. Governor's <u>ministerial tasks</u> is the recording of documents and filing of papers related to administering, facilitating and supporting private sector entrepreneurs and business owners who aspire to begin, expand, or reimagine their operations to establish competitive and/or economic advantages for themselves and their stakeholders.  Lt. Gov. Toland is the <u>Secretary of Commerce,</u> too.  His roles, job descriptions, and responsibilities for both are ***fiduciary*** in nature (<u>Black's Law</u>) and are designed as well as purposed to support others' affairs.

Lt. Gov. Toland is required to record and file documents and papers **in confidence** when a private sector author, creator, developer, inventor, and/or original work proprietor endeavors to start or further economic enterprises in the Sunflower State.  Lt. Gov. Toland and constituents are not allowed to assume control of or use for gains on behalf of themselves or the State of Kansas other's Intellectual Property, whether tangible or intangible, w/o a creator's consent (legal accord).

For example, Lt. Gov. Toland was not allowed ***discretion*** to reapportion Panasonic's plan (trade secret) entrusted to him to build an EV (electronic vehicle) <u>battery plant near DeSoto</u>, KS. He is/was not lawfully empowered to share it with a competitor or request appropriations from the State Legislature to build one to benefit the citizenry in a manner he feels may yield greater gains than a private endeavor might.  To do so would establish tortious interference, misappropriation of Panasonic's IP, etc.  Without doubt, <u>Panasonic's legal team</u> would bludgeon Mr. Toland in court. This example closely aligns with this matter. Lt. Gov. Toland had neither "discretionary" ability to expose Panasonic's private plans to competitors nor leeway to ask for State appropriations to plan, build, own, or operate a derivative of Panasonic's intentions like K-State is doing with mine. Lt. Gov. Toland, KSU leaders, and KSUF execs are fiduciaries <u>required to be of service to others</u>.

# EXHIBIT N

 **Solar Investment Tax Credit (ITC) 101**

A tax credit is a dollar-for-dollar reduction in the income taxes that a person or company would otherwise pay the federal government. The ITC is based on the amount of investment in solar property. Both the residential and commercial ITC are currently equal to 26 percent of the basis that is invested in eligible solar property which has begun construction through 2022. The ITC then steps down according to the following schedule:

### 1.10.4 Inappropriate Investors

It is hard for individuals, S corporations and closely-held C corporations to make full use of the tax credits and depreciation on commercial solar projects. For this reason, they are not usually appropriate tax equity investors. A corporation is "closely held" if five or fewer individuals own more than half the stock.

This is not true. (*Frank Aragona Trust v. Commissioner*)

Such investors face two hurdles that are not faced by large corporations.

⭐ Unless such an investor is involved personally in operating the project, he or she will be considered to have made a passive investment. The investor will end up only able to use the tax benefits as shelter against taxes on income from other passive investments. The passive loss restrictions limit the ability of such an investor to use both tax credits and depreciation.

"At-risk" rules are a second hurdle. The at-risk limits on the use of tax credits are different from the at-risk limits on the use of depreciation.  The at-risk limits for tax credits were discussed earlier in section 1.4.4. The at-risk rules for depreciation limit such an investor to claiming an amount of depreciation equal to the amount the investor has at risk in the project -- basically the amount of equity he or she has invested plus any debt at the project level whose repayment has been guaranteed by the investor. Developers would do better to look for more widely-held corporations as investors, since they are not subject to either set of passive loss or at-risk restrictions. ⭐

 **Martin, Keith** <keith.martin@nortonrosefulbright.com>                              Thu, Apr 25, 2019, 8:00 AM
to me

Thanks for your email.  I put your earlier note in my file for when we update the manual again.
...

**From:** Lenny Geist [mailto:kansasfreedomfarms@gmail.com]
**Sent:** Thursday, April 25, 2019 8:00 AM
**To:** Martin, Keith <keith.martin@nortonrosefulbright.com>
**Subject:** Verbiage and Interpretations of Tax Code Version 9 via SEIA

Good morning, Keith:

Thanks for connecting with me on LinkedIn. I appreciate it. I sent you a note there, too, that is a duplicate of this correspondence.

I have reviewed the Tax Code Version 9 document via SEIA.  I commend you for your work on developing that material. I am running into a common "interpretation" in the public domain of prospective investors who'd like to take advantage of the ITC for solar energy. They are interpreting "Inappropriate" (Investors) on page 43 as unlawful, ineligible, or illegal.  They are drawing the conclusion that active income for active investors is not allowed to use the ITC.  What can we (or the SEIA) do to reshape this thinking to more easily understand active investors can use the ITC against active income when they meet the requirements (at-risk, # hours, etc.)? Is there a better choice of words than Inappropriate and Appropriate for active and passive investor groups such as simply using Active and Passive as classification headers?  Perhaps using the labels Common (passive) and Select (active) to distinguish between the two in a manner that is much less likely for the layman to misinterpret so frequently? Thanks again, Keith, for connecting with me. I'm having a sizable number of discussions with accountants, attorneys and private investors who routinely interpret "Inappropriate" as meaning they can't participate (as active investors) because it's unlawful.  A few word choices to help clarify this for those unfamiliar will help. Thanks. Lenny Geist
CEO - Manager
Kansas Freedom Farms, LLC & NFP
11334 W. 131st St.
Overland Park, KS 66213
Cell:  (623) 687-4163

# EXHIBIT N (cont'd)







# EXHIBIT N (cont'd)



**Thanks for the Meeting & Follow Up Info**

**Lenny Geist** <kansasfreedomfarms@gmail.com>                                    Oct 16, 2017, 3:37 PM
to Lynn, Pat

Good afternoon, Congresswoman Jenkins & Mr. Leopold:

I want to thank you for hosting me in your Topeka office today to discuss the substantial and far reaching benefits TEA (Technology Enhanced Agriculture) will bring to our state and citizens.

I look forward to working with your staff members to find grants or agency funds as available.

Congruently, if you know of any private individuals, groups or other entities such as NFP organizations that would like to partner with my team and me to start TEA in Kansas, please connect us.  Our Kansas Freedom Farms enterprise simply needs capital to get started.  We're ready!

Thank you again for hosting our visit today and becoming more familiar with indoor farming.

My warm wishes,

Lenny Geist

Cell:  (623) 687-4163

---

**Henry, Dalton** <Dalton.Henry@mail.house.gov>                                  Thu, Sep 28, 2017, 8:05AM
to Katie, me

Mr. Geist – Thanks for reaching out. Certainly an interesting concept.

Two quick questions to help facilitate a meeting. Where are you located at? And do you have plans to be in D.C. in the near future? I saw the references in your proposal to McPherson County. We have a staff member that lives in McPherson (offices out of Salina) with background in agriculture that would be good to connect you with if you are in the area. Otherwise, I'm glad to touch base here in D.C.

Dalton

Dalton Henry-Legislative Director
Congressman Roger Marshall (KS-01) | 202-225-2715
312 Cannon House Office Building | Washington, DC 20515
Dalton.Henry@mail.house.gov

---



**Lenny Geist** <kansasfreedomfarms@gmail.com>                                    Mon, Aug 19, 2019, 6:33 PM
to Coletta, Sharice, Sharice

Good evening, Coletta and

from:     **Lenny Geist** <kansasfreedomfarms@gmail.com>
Thank you both for taking    to:       "Hummel, Coletta" <Coletta.Hummel@mail.house.gov>    nergy Extension Act of 2019 (attached) and related items of oppty.
                            cc:       Sharice Davids <sharice.davids@mail.house.gov>,
There are two links embed          Sharice Davids <sld77@cornell.edu>          that list the sponsors and co-sponsors of the proposed legislation.
                            date:     Aug 19, 2019, 6:33 PM
There are 30 in the House          subject:  Fwd: NewsWire                        g S 2289 with 12 Democrats and 4 Republicans on board.
                            mailed-by: gmail.com
The specific subsidy is und                                              ct 3 and throughout Kansas.  I've attached that document as well.

As we discussed, the dollar-for-dollar tax credits Kansans can use against personal, corporate, and trust income are unlimited and can benefit District 3 greatly.

Additionally, anyone's Estate Tax and capital gains tax liabilities can be converted to renewable energy credits to start new businesses in Kansas that benefit everyone.

It will be very helpful and politically effective for Congresswoman Davids to co-sponsor the Renewable Energy Extension Act of 2019 to directly benefit District 3 in big ways.

---



**Fwd: Fw: National Geographic: This Tiny Country Feeds the World. Jim Slattery**  Inbox ×

**John Carlin** <jwcarlin@gmail.com>                                              Mon, Oct 30, 2017, 2:13 PM
to me

Lenny: Got the attached from Jim Slattery and immediately thought of you. Seems like you are doing what they do in the Netherlands. Hope you are doing well and continuing to make progress.     John
---------- Forwarded message ----------
From: **John Carlin** <jwcarlin@ksu.edu>
Date: Mon, Oct 30, 2017 at 2:10 PM
Subject: Fw: National Geographic: This Tiny Country Feeds the World. Jim Slattery
To: jwcarlin <jwcarlin@gmail.com>

1
2

# EXHIBIT O

3

## KANSAS LEGISLATIVE RESEARCH DEPARTMENT

4

68-West–Statehouse, 300 SW 10th Ave.
Topeka, Kansas 66612-1504
(785) 296-3181 • FAX (785) 296-3824

5

kslegres@klrd.ks.gov                                                      http://www.kslegislature.org/klrd

6

### EMINENT DOMAIN

7
8

     This memorandum addresses the power of eminent domain and its use by the legislative branch, relevant case law at the federal and state level, the intersection of local government and eminent domain and permitted uses, and recent review of this topic by the Kansas Legislature.

9
10
11

     *Eminent domain*, in its simplest terms, is the inherent power of a governmental entity to take private property and convert it to public use. More specifically, it is the power of a public entity to take private property without the owner's consent, conditioned upon the payment of just compensation. Eminent domain is a right founded on the law of necessity, which is inherent in sovereignty and essential to the existence of government.

12

     The power of eminent domain belongs exclusively to the legislative branch and to those entities or individuals authorized by statute to exercise the power.

13
14
15

     The government's exercise of the power of eminent domain is subject to several important constitutional limits, including the requirement for payment of just compensation and the requirement that the property owner be granted due process of law, including notice and an opportunity for a hearing.

16

### Kansas Eminent Domain Restrictions—Economic Development

17
18
19

     The 2006 changes contained in Sub. for SB 323 prohibited the use of eminent domain for economic development purposes, unless the Legislature approves the taking; changed certain eminent domain procedures; and required surveys for lands to be taken through the exercise of eminent domain be performed by a licensed land surveyor or an engineer competent to conduct land surveys.

20
21

### *Takings for Benefit of a Private Entity Prohibition—Exceptions*

22
23

     The law (2006 Sub. for SB 323) provides that on and after July 1, 2007, the taking of private property by eminent domain for the purpose of selling, leasing, or transferring it to another private entity including takings under the tax increment financing law is not to be permitted unless the taking meets one of the following:

24
25
26

- The property is deemed excess real property that was taken lawfully and incidental to the acquisition of right-of-way for a public road, bridge, or public improvement project of the Kansas Department of Transportation or a municipality;

27

- The taking is by any public utility;

28
29

- The taking is by any gas gathering service, pipeline company, or railroad;

- The private property owner has acquiesced in writing to the taking by any municipality;

30

# EXHIBIT P

## The National Constitution Center's Discussion of the Fifth Amendment's "Taking Clause"

The Takings Clause of the Fifth Amendment to the United States Constitution reads as follows: "Nor shall private property be taken for public use, without just compensation." In understanding the provision, we both agree that it is helpful to keep in mind the reasons behind it. We agree that the Clause is intended to uphold the principle that the government should not single out isolated individuals to bear excessive burdens, even in support of an important public good. When this happens, the payment of "just compensation" provides a means of removing any special burden. The most influential statement of this principle is found in Armstrong v. United States (1960), where the Supreme Court wrote: "The Fifth Amendment's [Takings Clause] . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

For the Takings Clause to serve this principle effectively, we both agree that the guarantee of just compensation must apply at the very least to cases in which the government engages in the outright confiscation of property. This means more than merely the government taking a privately owned asset for itself. It also includes situations in which the government permanently deprives a private owner of possession of the asset or gives the asset (or the right to permanently physically occupy the asset) to someone else.

We agree that the compensation requirement must apply not only to land but to all forms of private property. At a minimum this means that the Clause applies to government confiscation of personal property, including interests as diverse as animals and corporate stock. The Clause also applies to the confiscation of all existing interests in any individual piece of property, but to the confiscation of certain lesser interests in property. Under Anglo-American law, these would include recognized interests like easements (such as rights of way), leases, mortgages, life estates, and remainders. The Clause also applies to the confiscation of intangible property, including intellectual property such as patents, copyrights, trademarks and trade secrets.

Although the Clause has not been read to apply to taxes, it does apply when the government seizes a specific pool of money, such as a bank account or a bag full of cash, or when it orders an individual to pay a specific amount of money.

We also agree that the Clause prohibits the government from confiscating property (even with just compensation) if it is not doing so for a public use. Although the boundaries of this prohibition are controversial, we agree that it encompasses at a minimum situations in which the government takes property from A for the purpose of giving it to B solely for B's private benefit.

We agree that the phrase "just compensation" means that the owner of the property shall receive at a minimum the fair market value of the property in its best alternative use, independent of the government taking. In most instances the compensation required is paid in cash, but in some situations, the government compensation may come in the form of some reciprocal or return benefit given to a party, such as the increase in the value of retained land when the government builds a road over that property.